# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) **KEITH GRANT**; | ) |
| (2) **STEPHANIE GRANT**, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 4:22-cv-00001-TCK-JFJ |
| | ) |
| (1) **FLYING BUD FARMS, LLC**, an | )   JURY TRIAL DEMANDED |
| Oklahoma limited liability company; | ) |
| (2) **PARAGON INDUSTRIES, INC.**, | ) |
| an Oklahoma corporation; | ) |
| (3) **ASSURANCE RESTORATION, LLC**, | ) |
| an Oklahoma limited liability company; | ) |
| (4) **GARY DAVID BACON, JR.**; | ) |
| (5) **BACON INVESTMENTS, LLC**, an | ) |
| Oklahoma limited liability company; | ) |
| (6) **DEREK WACHOB**; | ) |
| (7) **D-LUXE DISPENSARY, LLC**, an | ) |
| Oklahoma limited liability company; | ) |
| (8) **D-LUXE IP, LLC**, an Oklahoma limited | ) |
| liability company; | ) |
| (9) **D-LUXE FARMS, LLC**, an Oklahoma | ) |
| limited liability company; | ) |
| (10) **D-LUXE DISPOSAL, LLC**, an Oklahoma | ) |
| limited liability company; | ) |
| (11) **D-LUXE PROPERTIES, LLC**, an | ) |
| Oklahoma limited liability company; | ) |
| (12) **D-LUXE PROCESSING, LLC**, an | ) |
| Oklahoma limited liability company; | ) |
| (13) **D-LUXE HOLDINGS, LLC**, an Oklahoma | ) |
| limited liability company; | ) |
| (14) **D-LUXE HOLDINGS I, LLC**, an | ) |
| Oklahoma limited liability company; | ) |
| (15) **D-LUXE HOLDINGS II, LLC**, an | ) |
| Oklahoma limited liability company | ) |
| (16) **D-LUXE HOLDINGS III, LLC**, an | ) |
| Oklahoma limited liability company; | ) |

1

(17) **D-LUXE HOLDINGS IV, LLC**, an                )
     Oklahoma limited liability company;            )
(18) **D-LUXE INVESTMENTS I, LLC**, an             )
     Oklahoma limited liability company;            )
(19) **D-LUXE TRANSPORTATION, LLC**, an          )
     Oklahoma limited liability company;            )
(20) **D-LUXE EXPRESS DISPENSARY, LLC**,          )
     an Oklahoma limited liability company;         )
(21) **WIT D-LUXE HOLDINGS, LLC**, an             )
     Oklahoma limited liability company,            )
                                        )
                 Defendants.                      )

# COMPLAINT

Plaintiffs Keith and Stephanie Grant bring this action to vindicate their federal rights under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). The Grants also bring claims under Oklahoma law for private nuisance and injury to property. The Grants' personal residence is located on rural property they own in Creek County, Oklahoma, within the Northern District of Oklahoma. The Defendants constructed and operate a large, illegal, industrial marijuana grow operation approximately less than 50 feet from the Grants' property line and adjacent to their personal residence.

In addition to RICO, federal law prohibits the cultivation, possession, and distribution of marijuana, conspiracies to cultivate, possess, and distribute marijuana, and continuing criminal enterprises engaged in the business of illicit drug trafficking, all of which remain felony crimes under the Controlled Substances Act of 1970 ("CSA"). Cultivating marijuana for sale is racketeering activity in violation of RICO.[1]

---

[1] *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017).

Under RICO, the Grants are entitled to three times their actual damages, injunctive relief, costs, and attorneys' fees for Defendants' racketeering activity, that is, the commercial cultivation, possession, production, and distribution of marijuana.

Under the Oklahoma state nuisance laws, the Grants are entitled to actual damages, punitive damages, and injunctive relief. As set forth in more detail below, the Grants have suffered significant injury to their property and have lost the use and enjoyment of what was once a quiet, secluded, and safe homestead.

## I.
## INTRODUCTION

1.      Keith and Stephanie Grant chose to make their home in the country. Their home sits on several acres located just outside of Sapulpa in Creek County, Oklahoma. Keith grew up nearby. Keith's elderly parents still live across the road and his brothers live on the two properties immediately east of the Grants' home. The Grants chose the property because it was quiet, located adjacent to family, and provided solitude and security.

2.      In or about 2019,  Defendant Gary Bacon, Jr. established an unlawful marijuana grow operation, called Flying Bud Farms, next door to the Grants' personal residence. Shortly thereafter, Bacon and co-defendant Derek Wachob became business partners in the unlawful marijuana operation. Together, Defendants Bacon and Wachob expanded Flying Bud Farms, LLC to grow marijuana for sale to dispensaries, including their jointly-owned dispensary, D-Luxe Dispensary, LLC. Despite having 80 acres, Defendants Bacon and Wachob built the unlawful marijuana grow operation adjacent to the Grants' home and approximately 50 feet from the Grants' property line. Since the establishment of Flying Bud Farms, the Grants have lived in the constant presence of an openly operating unlawful marijuana cultivation and distribution

enterprise and a construction zone. As a result, the Grants can no longer enjoy their home. The pungent odor of marijuana is relentless. The odor is most potent when the marijuana is ready for harvest. The odor is so strong that it can even be smelled across the road at Keith's elderly parents' and aunt's homes. The Grants, who live just next door, experience the full force of the odor. The odor has caused Stephanie to experience severe allergy symptoms, headaches, and nausea. Nor can the Grants escape the noise, whether it is the noise of the large industrial fans circulating the stench of marijuana or the frequent noise of industrial construction equipment moving earth and erecting a massive perimeter fence. The construction activities at the illegal marijuana operation included altering a floodplain without obtaining the required permit. As a direct result of Defendants Bacon and Wachob altering the floodplain, the Grants' property and home experienced substantial flooding. The night and early morning hours are no better. The bright white marijuana grow houses are illuminated at night by industrial lights that shine into the Grants' windows and into their home.

3.      Defendants Wachob and Bacon own other businesses. Defendant Wachob owns Paragon Industries, Inc., a manufacturer of steel piping used primarily in the oil and gas industry. Defendant Bacon co-owns Assurance Restoration, LLC, a disaster restoration service company. Defendants Wachob and Bacon have used Paragon and Assurance Restoration to advance the unlawful marijuana grow operation, including, but not limited to, providing employees, materials and equipment, thereby rendering Paragon and Assurance Restoration associates of the unlawful RICO enterprise.

4.      Defendants Bacon and Wachob fly helicopters, often multiple times a day, to and from the illegal marijuana grow operation. While it is not necessary for Defendants Bacon and Wachob to fly directly over the Grants' home, they do so anyway at low altitudes. Sometimes they

will circle or idle the helicopters over the Grants' home, or even over the Grants themselves while the Grants are in their yard. Defendants Bacon and Wachob have left the helicopters running for up to 20 or 30 minutes after landing or before taking off. The Grants can hear the noise and feel the vibrations of the helicopters from within their home.

5.      Unlawful enterprises make for bad neighbors. This is especially true when the nature of the enterprise is drug trafficking. The Grants, whether inside or outside, have lost the use and enjoyment of their home. What was once a quiet and secluded home has become an unceasing unlawful industrial and construction zone. Not only have the Grants lost their use and enjoyment of their home, but they have suffered a loss in property value as a result of the nuisance, the open operation of an unlawful enterprise, and flooding. Homes next to unlawful enterprises, particularly those that are noisy, odorous, unsightly, and cause substantial flooding are simply not worth as much as quiet homes in the country.

6.      While Oklahoma legalized marijuana for medical use in 2018, the fact remains that marijuana cultivation, processing, distribution and sales remain federal felony crimes.  According to the Tenth Circuit, "[m]arijuana is a controlled substance under the CSA [Controlled Substances Act]. So the manufacture, distribution, and sale of that substance is, by definition, racketeering activity under RICO."[2]

7.      Here, the objects of the unlawful enterprise are to cultivate marijuana, possess marijuana, and commercially distribute marijuana for financial profit. Marijuana grow operations, by their very nature, emit pungent, foul odors. The infrastructure necessary to cultivate and grow

---

[2] *Safe Streets Alliance*, 859 F.3d at 884.

marijuana is an eyesore. The marijuana grow operation causes an increase in traffic, undesirable visitors, large cash transactions, and increased criminal activity. All of the foregoing, individually and in the aggregate, causes property values to drop and interferes in the use and enjoyment of what was supposed to be a quiet, secluded, and safe home.

8.      In *Safe Streets Alliance v. Hickenlooper*, the Tenth Circuit not only held that the cultivation of marijuana was per se racketeering activity, but also found "little difficulty concluding that the [Plaintiffs] plausibly pled an injury to their property rights caused by the stench that the enterprise's operations allegedly produce."[3] The Court concluded that the odor of the marijuana, and the presence of an openly operating criminal enterprise, plainly presented a plausible claim of interference with property, injury to property, and a diminution in the value of the property.[4]

9.      The Tenth Circuit's decision in *Safe Streets* dictates that marijuana operations, including grows and dispensaries, constitute unlawful racketeering activity under RICO. Those who engage in a pattern of racketeering activity are liable for three times the economic harm they cause plus costs and attorney's fees.

10.      Those who conspire with racketeers are equally liable under RICO.[5] It is not necessary that every conspirator engage in the unlawful cultivation and sale of marijuana. It is only necessary that the conspirators support the racketeering activity. Conspirators may include both individuals and companies that provide employees, equipment, materials, or funding to the racketeers. Such conspirators could include construction companies, rural broadband companies,

---

[3] *Id.* at 886.
[4] *Id.* at 886-87.
[5] *Salinas v. United States*, 522 U.S. 52, 64 (1997).

disaster restoration companies, steel piping companies, and others—as well as officers and directors of such companies.

11.     The Court has the authority to award damages of three times the actual harm, plus costs and attorney's fees, but also to order racketeers and their conspirators to immediately cease their unlawful activity pending the outcome of this litigation.

## II.
## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' RICO claims under 18 U.S.C. § 1964 and 28 U.S.C. § 1331.

13.     This Court has supplemental jurisdiction over Plaintiffs' state law nuisance and injury to property claims under 28 U.S.C. § 1367(a).

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all of the Defendants reside or transact business in the Northern District of Oklahoma and a substantial portion of the events giving rise to this suit occurred in the Northern District of Oklahoma. Venue over Plaintiffs' RICO claims is also proper under 18 U.S.C. § 1965(a) because the RICO Defendants reside in the Northern District of Oklahoma and transact affairs in the Northern District of Oklahoma.

## III.
## PARTIES

15.     Plaintiffs Keith and Stephanie Grant are residents of Creek County, Oklahoma who own and live on approximately 15 acres of land immediately east and adjacent to the unlawful marijuana grow operation.

16.     Defendant Flying Bud Farms, LLC ("Flying Bud") is an Oklahoma limited liability company that has its principal place of business at 12260 W. 171st Street S, Sapulpa, Oklahoma 74066. Flying Bud operates an unlawful marijuana grow operation, licensed by the State of Oklahoma, License Number GAAA-NYJO-QJDG.

17.     Defendant Gary David Bacon, Jr. ("Bacon") is a member of Flying Bud. Bacon also co-owns Assurance Restoration, LLC, Bacon Investments, LLC and, upon information and belief, is an owner of some or all of the D-Luxe entities either individually or through his investment company, Bacon Investments, LLC. He resides at 12260 W. 171st Street S, Sapulpa, Oklahoma 74066.

18.     Defendant Bacon Investments, LLC ("Bacon Investments") is an Oklahoma limited liability company that has its principal place of business in Creek County, Oklahoma. Upon information and belief, Bacon Investments is wholly owned by Bacon.

19.     Defendant Derek Wachob ("Wachob") is an owner of the D-Luxe entities, an owner of Paragon Industries, and participates in the direction, control, and management of Flying Bud. Wachob resides in Creek County, Oklahoma.

20.     Defendant D-Luxe Dispensary, LLC is an Oklahoma limited liability company that has its principal place of business at 927 S. Main Street, Sapulpa, Oklahoma 74066. D-Luxe Dispensary, LLC is an unlawful marijuana dispensary, licensed by the State of Oklahoma, License Number DAAA-JJX4-D7OP. D-Luxe Dispensary, LLC and Flying Bud are designated as "Associated Entities" on D-Luxe Dispensary, LLC's license application submitted to the Oklahoma Medical Marijuana Authority ("OMMA"). D-Luxe Dispensary, LLC is wholly owned by D-Luxe Holdings, LLC. D-Luxe Holdings, LLC is owned 50/50 by Defendants Wachob and

Bacon, either individually or through Bacon Investments. D-Luxe Dispensary, LLC and D-Luxe Holdings, LLC, along with D-Luxe IP, LLC, D-Luxe Farms, LLC, D-Luxe Disposal, LLC, D-Luxe Properties, LLC, D-Luxe Processing, LLC, D-Luxe Holdings I, LLC, D-Luxe Holdings II, LLC, D-Luxe Holdings III, LLC, D-Luxe Holdings IV, LLC, D-Luxe Investments I, LLC, D-Luxe Transportation, LLC, D-Luxe Express Dispensary, LLC, and Wit-D-Luxe Holdings, LLC, are all Oklahoma limited liability companies with their principal place of business in Creek County, Oklahoma. Upon information and belief, all of the foregoing entities are associated with each other, are part of a collective family of companies, and have common ownership. All of the D-Luxe entities identified herein shall be collectively referred to as "D-Luxe" throughout the Complaint. D-Luxe sells all kinds of unlawful marijuana products, including flower, concentrates, edibles, pre-rolls, topicals, and CBD extract. D-Luxe holds itself out as "a firm built on integrity by a TEAM working in unison towards a common goal of providing the highest level of customer satisfaction."[6]

21.     Defendant Paragon Industries, Inc. ("Paragon") is an Oklahoma corporation with its principal place of business at 3378 W. Highway 117, Sapulpa, Oklahoma, 74066. Paragon manufactures steel piping, primarily used in the oil and gas industry. Paragon holds itself out as "a Team working in unison toward a common goal of providing the highest level of customer satisfaction."[7]

22.     Defendant Assurance Restoration, LLC ("Assurance Restoration") is an Oklahoma limited liability company that has its principal place of business at 711 East Taft Street,

---

[6] https://d-luxedispensary.com/ (Last accessed December 30, 2021).
[7] http://www.paragonindinc.com/company (Last accessed December 30, 2021).

Sapulpa, OK 74066. Assurance Restoration provides fire, wind, water, and disaster restoration services.

## IV.
## THE NATURE OF THE UNLAWFUL MARIJUANA CULTIVATION AND DISTRIBUTION  CONSPIRACY AND CONTINUING ENTERPRISE

### The Defendants

23.     The objects of the unlawful marijuana cultivation and distribution enterprise are to cultivate marijuana, possess marijuana, and commercially distribute marijuana for financial profit. The conspirators include, but may not be limited to, Defendants Wachob, Bacon, Bacon Investments, Flying Bud, D-Luxe, Paragon, and Assurance Restoration. These Defendants shall be referred to collectively as the "Defendants."

24.     The Defendants engaged in a variety of methods and means to achieve the objects of the conspiracy, including but not limited to:

a. The Defendants would and did construct and operate an unlawful marijuana grow facility known as Flying Bud Farms.

b. The Defendants would and did  construct facilities and purchase equipment specifically designed for the cultivation of marijuana.

c. The Defendants would and did engage a broadband company to run fiber optics to the unlawful marijuana grow operation.

d. The Defendants would and did use legal process to take possession of the property on which they constructed and operate the unlawful marijuana grow operation.

e. The Defendants would and did facilitate the construction and erection of facilities necessary to commercially cultivate, possess, store, and distribute marijuana.

f. The Defendants would and did construct and operate D-Luxe, which includes dispensaries and a variety of other businesses designed to achieve and distribute profits from the conspiracy.

g. The Defendants would and did use facilities of interstate communication, to wit, the internet and telephones, to promote, advertise, coordinate, and otherwise facilitate the commercial sale of marijuana.

25.     The Defendants acted in interdependence, each relying on the other, to achieve the objects of their unlawful marijuana cultivation and distribution enterprise:

    a.    Defendant Flying Bud operates the illegal marijuana grow facility.

    b.    Defendant D-Luxe transports, advertises and sells the unlawful marijuana product in a variety of forms. D-Luxe also manages the proceeds from the drug trafficking.

    c.    Defendant Paragon provides the marijuana cultivation and distribution enterprise with resources including but not limited to employees, equipment, and materials.

    d.    Defendant Assurance Restoration provides the marijuana cultivation and distribution enterprise with resources including but not limited to employees, equipment, and materials.

    e.    Defendant Wachob controls and directs Flying Bud, D-Luxe, and Paragon. Defendant Wachob provides his time, money, effort, and control of his business interests to advance the marijuana cultivation and distribution enterprise.

    f.    Defendant Bacon controls and directs Flying Bud, D-Luxe, Assurance Restoration, and Bacon Investments. Bacon provides his time, money, effort, and control of his business interests to advance the marijuana cultivation and distribution enterprise.

    g.    Upon information and belief, Defendant Bacon Investments receives proceeds from the marijuana cultivation and distribution enterprise.

### It is Unlawful Under Federal Law to Manufacture and Distribute Marijuana

26.     Congress passed the CSA in 1970 as Title II of the Comprehensive Drug Abuse Prevention and Control Act. Congress intended the CSA, among other things, to reduce drug abuse and the illegitimate traffic in controlled substances in the United States by prohibiting the unauthorized production, distribution, or possession of controlled substances.

27.     When it passed the CSA, Congress found that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people," 21 U.S.C. § 801(2), and that "[a] major portion of the traffic in controlled substances flows through

interstate and foreign commerce," *id.* § 801(3). The CSA seeks to remedy the social and economic ills caused by drug abuse and drug trafficking by prohibiting the illicit drug trade.

28.     The CSA categorizes drugs according to a series of schedules, with the most dangerous drugs falling under Schedule I. *See id.* § 812(b). Schedule I drugs have "a high potential for abuse." *Id.* § 812(b)(1). Congress classified marijuana as a Schedule I drug. *Id.* § 812(c). Congress thus deemed marijuana to have a high potential for abuse. *Id.* § 812(b)(1). By classifying marijuana as a Schedule I drug, as opposed to classifying it on a lesser schedule, Congress made the manufacture, distribution, or possession of marijuana a criminal offense, with only one exception: use of the drug as part of a Food and Drug Administration preapproved research study. *Id.* §§ 823(f), 841(a)(1), 844(a).

29.     The large-scale manufacture and distribution of marijuana is a felony under the CSA. A first-time offender convicted of producing or distributing 1,000 or more marijuana plants is subject to a sentence of not less than 10 years and up to life imprisonment. *Id.* § 841(b)(1)(A). Growing 100 or more marijuana plants subjects the first-time offender to a sentence of 5 to 40 years imprisonment. *Id.* § 841(b)(1)(B). The cultivation and sale of smaller amounts of marijuana is punishable by maximum sentences that can be as long as 20 years' imprisonment. *See id.* § 841(b)(1)(C),(D). The CSA also criminalizes the possession of marijuana. *Id.* § 844(a).

30.     The CSA prohibits many other activities associated with the operation of a marijuana business. The CSA makes it a crime to possess "any equipment, chemical, product, or material" with the intent to use it to manufacture marijuana, *id.* § 843(a)(6), or to distribute any such material with knowledge that it will be used to manufacture marijuana, *id.* § 843(a)(7). The CSA prohibits the use of a telephone, email, mail, or any other "communication facility" in

furtherance of the manufacture or sale of marijuana, *id.* § 843(b), and it is a federal crime to utilize the internet to advertise the sale of marijuana, *id.* § 843(c)(2)(A). It is a crime to reinvest the proceeds from marijuana operations, *id.* § 854(a), as is knowingly facilitating a financial transaction involving funds derived from manufacturing and selling marijuana, 18 U.S.C. §§ 1956, 1957, 1960. It is a crime to knowingly lease, rent, maintain, manage, or control a place where marijuana is manufactured or sold. 21 U.S.C. § 856. Leading five or more people who commit a continuing series of federal marijuana crimes, as has occurred here, is an especially serious offense. *Id.* § 848. Attempting or conspiring to commit most of these crimes is also a criminal offense. *See id.* § 846; 18 U.S.C. §§ 1956(a)(1), 1956(h), and 1957(a).

31.     The federal criminal prohibitions on the marijuana cultivation and distribution business make it clear that the federal government considers marijuana to be a dangerous drug. RICO defines most violations of the CSA as "racketeering activity." 18 U.S.C. § 1961(1)(D). Thus, any business engaged in the commercial cultivation and sale of marijuana is an unlawful operation for purposes of federal law. Those who conduct or conspire to assist such operations are subject to the criminal penalties and civil liability that RICO imposes. *See id.* § 1962(c), (d).

32.     As recently as July 30, 2021, the Sixth Circuit Court of Appeals affirmed the conviction of a marijuana dispensary owner, noting that "[s]tate law aside, marijuana remains illegal under federal law." [8] Moreover, the court was unpersuaded by the "attitude of 'defiance' toward federal law" and observed the defendant "repeatedly tried to suggest to the jury that his

---

[8] *United Stats v. Trevino*, 7 F.4th 414, 419 (6th Cir. 2021).

conduct was legal under state law, even though the court had already held such testimony irrelevant."[9]

### It is Unlawful Under Federal Law to Knowingly Conspire with a Marijuana Cultivation and Distribution Enterprise

33.     The United States Supreme Court, in its landmark decision *Pinkerton v. United States*, held that the act of one conspirator is attributable to all the conspirators. The Supreme Court rejected the argument that a conspirator cannot be held responsible for the substantive criminal offense for merely participating in the conspiracy or, in other words, that each conspirator must engage in the substantive offense. The Court held that a conspirator need not commit the substantive offense because other acts taken in furtherance of the conspiracy are attributable to each conspirator for the purpose of holding them responsible for the substantive offense.[10] The foregoing is commonly referred to as "Pinkerton liability."

34.     The United States Supreme Court extended Pinkerton liability to RICO conspiracies in *Salinas v. United States*, 522 U.S. 52, 63 (1997). The Court interpreted the RICO conspiracy provision, 18 U.S.C. § 1962(d), as "even more comprehensive than the general conspiracy offense[.]"[11] "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."[12]

35.     It is not necessary that all RICO conspirators commit an overt criminal act. "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to

---

[9] *Id.* at 432.

[10] *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).

[11] *Salinas*, 522 U.S. at 63.

[12] *Id.*

provide support, the supporters are as guilty as the perpetrators."[13] "One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense."[14]

36.    The United States Supreme Court's decisions in *Pinkerton* and *Salinas* make clear that anyone who participates in or takes actions in furtherance of the conspiracy is liable for the underlying substantive criminal racketeering. This is so even though the participant may not themselves have committed the racketeering offense. It is sufficient that the conspirator has taken action with the intent to advance the enterprise.

37.    Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Cultivating and selling marijuana is a federal crime and constitutes racketeering activity. Under *Pinkerton* liability, anyone who provides assistance to an illegal marijuana grow or distribution operation is equally liable for conspiring to engage in racketeering activity. It is not necessary that each conspirator engage in the underlying substantive marijuana cultivation and distribution. It is sufficient that the conspirator assisted the cultivation, processing and distribution operation.

## V. FACTUAL ALLEGATIONS
### The Grants' Property and Home

38.    The Grants own approximately 15 acres of land in the country near Sapulpa, Oklahoma. The Grants live in a home that is situated on a five-acre tract near their land's western property line.

---

[13] *Id.* at 64.
[14] *Id.* at 65.

39.     While all land is unique, the Grants' property is particularly special to them. Keith's family have lived in the immediate area his entire life. Today, Keith's elderly parents live across the road in the same home in which Keith was raised.  One of his brothers resides on the property immediately east of the Grants'. Another of Keith's brothers resides on the next adjacent property to the east. Two of Keith's aunts also live across the road from the Grants. The Grants place significant value on living close to their family and in the same area in which Keith grew up, and in close proximity to his aging parents for whom the Grants provide help and care.

### Flying Bud Farms' Participation in
### The Marijuana Cultivation and Distribution Enterprise

40.     Defendant Flying Bud Farms commercially grows, cultivates, and distributes marijuana. Flying Bud filed its limited liability company Articles of Organization with the State of Oklahoma on December 3, 2018, and its Certificate of Limited Liability Company was issued the same day by the State of Oklahoma.

41.     The State of Oklahoma approved Flying Bud's marijuana grow license on January 16, 2019. Flying Bud is licensed by the State of Oklahoma to grow and cultivate marijuana, License Number GAAA-NYJO-QJDG.

42.     Defendant Bacon owns, operates, controls, and directs Flying Bud. Flying Bud operates at 12260 W. 171st Street S., Sapulpa, Oklahoma 74066, which is west and immediately adjacent to the Grants' property.

43.     Defendants Wachob and Bacon are associated with each other, and each is associated with Flying Bud's unlawful marijuana cultivation and distribution operation. Defendant

Wachob has authority equal to Defendant Bacon to operate, control, and direct the activities of Flying Bud. Flying Bud operates openly and notoriously.

44.     In the Spring of 2019, Defendant Bacon began construction of the illegal marijuana grow operation on the 12260 W. 171st Street property. In early 2020, Wachob and Bacon became partners and began construction to greatly expand the operation.

45.     Upon information and belief, in constructing the unlawful marijuana grow operation, Defendants Wachob and Bacon utilized their other companies, Defendants Paragon and Assurance Restoration, to provide employees, materials, supplies, and financing for the construction project. The Defendants all understood that the property would be used to unlawfully grow and cultivate marijuana for sale to Defendant D-Luxe and other dispensaries who would then in turn engage in the illegal commercial sale of marijuana to consumers. The construction included infrastructure and facilities specially designed for the cultivation and growth of marijuana to advance the object of the conspiracy. This included the construction of three large grow houses, a two buildings, numerous outdoor growth pods, and numerous outdoor A/C units and industrial fans. Possessing and constructing these facilities, equipment, products, and materials for the cultivation and processing of marijuana violates 21 U.S.C. § 843(a)(6) and is racketeering activity under 18 U.S.C. § 1961(1)(D).

46.     Although Defendant Bacon lived on the property at 12260 W. 171st Street, he did not possess title to the 12260 W. 171st Street property when construction began. In furtherance of the marijuana cultivation and distribution enterprise, on June 22, 2020, Defendant Bacon filed a Petition in the District Court in and for Creek County, Oklahoma to gain title to the 12260 W. 171st Street property through adverse possession from Debra Duck Bacon, Defendant Bacon's

stepmother. In his adverse possession lawsuit, Defendant Bacon alleged he had made "permanent and valuable improvements on the Property" including "(i) asphalt roadways; (ii) fencing, gates and other landscape amenities; (iii) pond construction and improvements; (iv) two (2) multi-purpose use barns, and (v) three (3) greenhouse structures and an accessory dwelling." Bacon alleged that these improvements were valued "in excess of one million dollars ($1,000.000.00)." Many, if not all, of the "improvements" described in Defendant Bacon's adverse possession Petition refer to the infrastructure for the illegal marijuana grow operation. The adverse possession action was dismissed with prejudice by stipulation of the parties on March 1, 2021.

47.     Defendant Bacon's attorney of record in the adverse possession action, David R. Widdoes, is, upon information and belief, counsel for Defendant Flying Bud, and Defendants Bacon and Wachob. David Widdoes is also the City Attorney for the City of Sapulpa, Oklahoma, who in his capacity as City Attorney has advised the City with respect to the unlawful marijuana grow operation at Flying Bud and the unlawful marijuana sales operation at D-Luxe. David Widdoes is also the General Counsel for, and has an ownership interest in, Airlink Internet Services, LLC, which delivered broadband to the unlawful marijuana grow operation.

48.     The 12260 W. 171st Street property is an approximately 80-acre parcel of land. Despite the acreage, the Defendants constructed the unlawful marijuana grow facility approximately less than 50 feet from the Grants' property line and immediately adjacent to the Grants' home.



Aerial view of the Grants' property and Bacon's adjoining property prior to the construction of Flying Bud.



Aerial view of the Grants' property and Bacon's property following the construction of Flying Bud.



Aerial view of Flying Bud's illegal marijuana property. The Grants' home is depicted within the circle in the top right corner of the photograph.

50.     The photographs below depict the proximity of the unlawful marijuana grow facility from the Grants' property. The first photograph is taken from the Grants' above-ground pool. The second photograph shows the fence on the Grants' property line in the foreground, and the third photograph depicts the view from the Grants' patio:



View of the unlawful marijuana operation from the Grants' pool deck.



View of the unlawful marijuana operation's grow houses from the Grants' fence line.



View of the unlawful marijuana operation from the Grants' back porch.

51.     The additional photographs below depict the proximity of the unlawful marijuana operation to the Grants' property. The fence depicted in the picture divides the Grants' property and the property on which the unlawful marijuana operation was constructed:



View of construction of the illegal marijuana operation's grow houses from the Grants' property.



View of the illegal marijuana operation's completed grow houses and industrial fans from the Grants' property.



View of the illegal marijuana operation's grow houses and shop building from the Grants' property.

52.     The photograph below depicts the proximity of the unlawful marijuana grow operation as seen from the Grants' living room window:



View of the unlfawful marijuana operation from the Grants' living room window.

53.     Defendant Flying Bud's illegal marijuana grow facilities are currently operational. The Defendants' manufacture and possession of marijuana with the intent to distribute it violates 21 U.S.C. § 841(a) and is racketeering activity under 18 U.S.C. § 1961(1)(D).

54.     Upon information and belief, the Defendants used cellular telephones, e-mail, the wires, and other facilities of interstate communication in furtherance of their efforts to unlawfully develop and use the 12260 W. 171st Street property to commercially cultivate, poossess, and distribute marijuana. Such communications violate 21 U.S.C. § 843(b) and constitute racketeering activity under 18 U.S.C. § 1961(1)(D).

55.     The Defendants together formed an association-in-fact enterprise for the purpose of cultivating, possessing, and distributing marijuana at the 12260 W. 171st Street property and providing it to Defendant D-Luxe and other dispensaries for retail distribution. To that end, it is on information and belief that the Defendants work together, each for the benefit of the other, sharing their resources, knowledge, skills, labor, and, as set forth more fully below, their other businesses to achieve through an enterprise of efficiencies the cultivation and distribution of marijuana.

56.     The Defendants have relationships with each other and collaborate together to contribute to the association-in-fact enterprise's cultivation, growth, and commercial sale of marijuana and are thereby engaged in an ongoing pattern of racketeering activity. The Defendants are aware that a marijuana grow enterprise is operating in violation of federal law at 12260 W. 171st Street in Creek County, Oklahoma.

57.     Defendants Wachob and Bacon, who in turn collectively direct and control Defendants Paragon, Assurance Restoration, and D-Luxe, are the leaders and organizers and

decision makers of the unlawful marijuana cultivation and distribution enterprise. Defendants Wachob and Bacon both exercise roles in managing the enterprise's affairs and hold themselves out as those with the authority to direct, control, or otherwise influence the marijuana cultivation and distribution operation.

58.     By its very nature, the cultivation of marijuana at the 12260 W. 171st Street property emits a persistent, pungent, and noxious odor of marijuana that travels onto the Grants' property and well-beyond. In fact, the marijuana stench is so strong that it is consistently and easily smelled across the road at Keith's parents' home. The stench is overwhelming at the Grants' property approximately less than 50 feet from the unlawful marijuana cultivation and distribution operation.

59.     Defendant Flying Bud uses industrial fans to circulate air through the grow operation. The fans draw air through the grow houses and vent the air out toward the Grants' property, resulting in an exacerbation of the marijuana odor on the Grants' property. In addition to the stench, the industrial fans themselves are noisy and can easily be heard from the Grants' property. The photographs below depict the industrial fans. The fence in the foreground of the picture on the left is the Grants' property line fence:

 

View of the industrial fans from the Grants' property.

60.     In addition to the noxious odor, the unlawful marijuana grow facility is an eyesore. What was once a rural, wooded landscape, is now an industrial complex with large industrial grow houses and the metal shop/office. These facilities dominate the view from the back of the Grants' home and can be seen from the Grants' living room and backyard.

61.     Since the construction of the illegal marijuana grow facility and its emission of noxious odors, persons visiting the Grants' home have commented on the strong odor. This has included family, friends, guests, and contractors.

62.     In or about the evening and night, the marijuana grow houses emit a bright white light that illuminates the Grants backyard and portions of the interior of their personal residence. The photograph below depicts the view of the unlawful marijuana grow operation at night from the Grants' living room window and back porch:

View of the unlawful marijuana operation
from the Grants' living room window at night.



63.     The Defendants continue to expand the unlawful marijuana cultivation and distribution facilities and operation. The Defendants installed a bright floodlight that shines directly into the Grants' backyard and home. The photograph below depicts the bright floodlight as seen from the Grants' back porch at night and is the same light that can be seen in the photograph above from the Grants' living room window:



View of the unlawful marijuana grow operation and its floodlight at night as seen from the Grants' back porch.

64.     Since in or about 2020, Flying Bud has been in a constant state of construction, continuing to expand its operations and facilities on the 12260 W. 171st Street property. The Grants have endured over a year of nearly ceaseless construction involving heavy industrial equipment. The construction involves a steady stream of workers, large machinery, and loud noise. Construction often began as early as 4:30 in the morning. The photographs below depict the Grants' view from their back porch of the Defendants' use of heavy industrial equipment to expand the unlawful marijuana grow facility.

 

View from the Grants' back porch of industrial equipment at the unlawful marijuana operation.

65.     The State Fire Marshall's office has jurisdiction over building permits in unincorporated areas like Defendant Bacon's property with the unlawful marijuana grow operation. Upon information and belief, the Defendants did not obtain the requisite permits for the construction of the unlawful marijuana grow facility from the State Fire Marshall's Office.

66.     The Defendants have constructed, and continue to construct, a towering industrial perimeter fence around the unlawful marijuana grow facility at Flying Bud. The fence looms large over the Grants' property and is constructed of steel piping, chain link and black cloth. The foundation of the fencing required extensive excavation and destruction of a large segment of the wooded area behind the Grants' property. These woods, and the trees destroyed to construct the fence, are not the property of Defendants.

67.     The photographs below depict ongoing construction of the perimeter fence, including the construction of the steel piping foundation for the fence:



View from the Grants' property of the unlawful marijuana operation's construction of the industrial perimeter fence.



View from the Grants' property of the unlawful marijuana operation's construction of the industrial perimeter fence.



View from the Grants' property of the unlawful marijuana operation's construction of the industrial perimeter fence.



View of the steel piping used to construct the industrial perimeter fence.



View of the steel piping used to construct the industrial perimeter fence.



View of the completed industrial perimeter fence on the north side of the unlawful marijuana grow operation.

68.     Large segments of the 12260 W. 171st Street property are situated within a floodplain.

69.     In 2020, in connection with the construction of the marijuana facility, the Defendants made significant alterations to the land situated within the floodplain. Dump trucks dumped massive amounts of backfill, including shale and gravel into a large, sloped area to level the space for expansion of the unlawful marijuana grow operation. The traffic of industrial dump trucks and concrete trucks was so heavy that the country road in front of the Grants' house had to be repaired by the county. The noise associated with this backfill project was loud and substantially interfered with the Grants' use and enjoyment of their property during both the day and night.

70.     The below photographs depict the construction work that was done within the floodplain. Many of the photographs depict the view from the Grants' property:



View from the Grants' property of dump trucks entering and leaving the unlawful marijuana operation.



View from the Grants' property of a concrete truck entering the unlawful marijuana operation.



View from the Grants' property of a truck leaving the unlawful marijuana operation.



View from the Grants' property of the land situated within the floodplain as construction progressed.



View from the Grants' property of the land situated within the floodplain as construction progressed.



View from the Grants' property of the land situated within the floodplain, including large amounts of backfill.



View from the Grants' property of work crews backfilling the land situated within the floodplain.



View from the Grants' pool deck of heavy industrial equipment working within the flood plain.



View from the Grants' property of ongoing construction and backfill within the floodplain.



View from the Grants' property of ongoing construction and backfill within the floodplain.



View from the Grants' property of ongoing construction and backfill within the floodplain.



View of the marijuana grow outdoor pods situated on the backfill within the floodplain.



View of the marijuana grow outdoor pods and heavy industrial equipment situated on the backfill within the floodplain.



View of the marijuana grow outdoor pods situated on the backfill within the floodplain.

71.   The photographs below depict the same general construction area as the photographs depicted above. However, the photographs below were taken from the Grants' pool deck. The pool deck and its railing can be seen in the foreground. In the background is the fence on the property line between the Grants' property and the unlawful marijuana grow operation. Just on the opposite side of the fence are the marijuana grow houses, one of which is under construction in the first photograph. The vehicles depicted in the photograph are parked on the segment of land that was backfilled. The pictures demonstrate the proximity of the construction site and unlawful marijuana grow operation to the Grants' home:



View from the Grants' pool deck of construction of the unlawful marijuana grow house.



View from the Grants' pool deck of construction of the unlawful marijuana grow house.

72.     The picture below depicts an aerial view of the Grants' property and the unlawful marijuana grow operation property. The area highlighted in blue depicts the segments of the properties that are within the floodplain. As can be seen from the picture, large areas of the marijuana grow operation, which were backfilled, are within the floodplain:



View of the unlawful marijuana operation overlaid by the floodplain.

73.     The Defendants did not obtain the appropriate governmental approval to alter the floodplain from the Creek County Floodplain Management Board, the board responsible for approving application for development in floodplains within Creek County. The Creek County floodplain administrator had advised Defendant Bacon to survey the property before initiating construction. However, the Defendants did not advise the Creek County Floodplain Administrator and initiated constructed within the floodplain. The Creek County Floodplain Administrator

confirmed that the Defendants did in fact alter the floodplain without a permit and that the "earth-moving activity on-site had caused a rise in elevation in the creek levels."

74.     As a result of the Defendants' alteration to the floodplain, the Grants experienced significant flooding following rainfall, including standing water in the Grants' garage. The Grants have not previously experienced flooding of this type on their property and had never experienced standing water in their garage—including during the record rainfall and flooding during the Spring of 2019—until the Defendants' construction and backfill within the floodplain. The flooding of the Grants' property has substantially interfered with their use and enjoyment of their property.

75.     The photograph below depicts stormwater flowing from the 12260 W. 171st Street property. This particular segment of the 12260 W. 171st Street property is near the property line shared with the Grants. The property behind the barbed-wire fencing and to the right of the steel posts is the area of the floodplain that was altered from the backfill. The unlawful marijuana grow facility can be seen in the top right of the photograph:



View of running stormwater in the area of construction within the floodplain.

76.     The following photographs depict the Grants' property during recent flooding, including their garage and the front of their property:



View of the Grants' garage during recent flooding.







View of the Grants' property as seen from their front porch during recent flooding.

77.     The Defendants constructed drainage pipes at the unlawful marijuana cultivation and distribution facility that redirect stormwater. The Grants have observed the drainage pipes release discolored water that has a silver sheen as well as some orange coloration.

78.     The ongoing construction and operations of the unlawful marijuana grow facility have substantially increased the amount of people flowing in and out of what was once a quiet and secluded area.

79.     Medical marijuana is governed in Oklahoma by the Oklahoma Medical Marijuana Authority ("OMMA"). The OMMA promulgates regulations that marijuana grow facilities, including Flying Bud, must follow to operate legally in Oklahoma. These regulations include specific security controls set forth in the Oklahoma Administrative Code § 475: 20-1-4. Required security controls under § 475: 20-1-4 include:

    a.  All in-process medical marijuana shall be returned to the storage area at the termination of the process. If the process is not terminated at the end of the workday, the medical marijuana shall be securely locked.

    b.  Each building shall require a security alarm system that, upon unauthorized entry, shall transmit a signal directly to a central station protection company, or a local or state police agency, or a 24-hour control station operated by the registrant.

    c.  Each building shall be equipped with self-closing and self-locking doors.

    d.  Any outdoor greenhouse facility shall be entirely surrounded by a fence and entry gates. Among other things, the fence must obscure the outdoor or greenhouse facility so that it is not easily viewed from outside the fence or entry gates.

    e.  The medical marijuana commercial growing, processing, packaging, and manufacturing areas shall be accessible only to an absolute minimum number of authorized employees.

80.     Defendant Flying Bud has operated in violation of the foregoing Oklahoma Administrative Code. For example, Flying Bud operates openly and notoriously. For most of its

existence, there was no fence around the facility, let alone one that completely obscured the outdoor grow and grow houses. While Flying Bud recently constructed a large industrial fence on the north side of the facility, for all of 2020 and most of 2021, there was no fence on the east side of the facility between the unlawful marijuana grow and the Grants' property. During this time, anyone could easily enter the unlawful marijuana grow facility from the Grants' property.

81.     Defendant Flying Bud has not limited access to its facility to only an absolute minimum number of authorized employees. Instead, the Grants have observed a steady traffic of individuals entering and exiting the marijuana grow facility.

82.     Defendant Flying Bud does not either return all marijuana to a storage area or secure the marijuana by locking it at the end of the day.

83.     Upon information and belief, the buildings at the marijuana facility are not properly equipped with security features in compliance with the Oklahoma Administrative Code.

84.     Defendants Wachob and Bacon fly helicopters in and out of the 12260 W. 171st Street property. The tail numbers for the helicopters in and out of the property are N-442LN, N407VC, N967BK, and 418SV. Defendant Wachob will sometimes fly his jet engine propelled helicopter to and from the unlawful marijuana grow facility multiple times a single day, including up to seven landings and take offs in a single day. Sometimes Defendants Wachob and Bacon will not turn the helicopter off after it lands. Instead, they will leave the helicopter running until they return to the helicopter and take off.

85.     The photographs below depict the helicopters and their proximity to the Grants' property. The fence depicted in the photograph is the fence dividing the Grants' property from the unlawful marijuana grow operation:



View from the Grants' property of the helicopter in flight.



View from the Grants' property of the helicopter at the unlawful marijuana operation.



View from the Grants' property of the helicopter in flight.

86.     Defendants Wachob and Bacon routinely fly their helicopters at low altitudes over the Grants' home, including after the Grants made lawful inquiries and complaints to authorities about the unlawful construction and operation of the marijuana operation and helicopter traffic and noise.

87.     The Defendants' helicopters are loud, obnoxious, and cause vibrations. The Grants can hear the noise of the helicopter and feel its vibrations from both inside and outside their home.

88.     Defendant Wachob advised the Grants that he and Defendant Bacon intend to expand Flying Bud to include processing marijuana in addition to growing marijuana. Processing requires a separate state license and would require rezoning from Agriculture to Commercial. Defednant Wachob stated that the Defendants intended to add a lab and processing facility, and an additional six indoor grow rooms.

89.     In addition to the Grants' loss of their use and enjoyment of the property, the noxious odors, noise, flooding, and open unlawful activity have all injured the value of the Grants' property. The many advantages of living in the country are destroyed by the unlawful marijuana grow operation. The Grants' property is less suitable for residential and recreational purposes than it was before the unlawful marijuana grow operation. A prospective buyer would reasonably be less inclined to purchase the property, or would value the property less, due to the odor, noise, flooding, and unlawful activity. As a result, the unlawful marijuana grow operation has directly and proximately caused a decline in the market value of the Grants' property and made it more difficult to sell at any price.

### Paragon Industries' Participation in the Marijuana Cultivation and Distribution Enterprise

90.     Defendant Wachob owns Paragon and controls and directs its operations.

91.      Defendant Paragon associates itself with the illegal marijuana grow enterprise at Flying Bud.

92.     Paragon supports the illegal marijuana grow enterprise by providing employees, equipment, materials, and financial support to Flying Bud and its operations.

93.     Upon information and belief, Paragon facilitated the provision of loads of gravel and shale used to alter the floodplain in order to expand the marijuana enterprise, all in furtherance of the racketeering activity.

94.     Upon information and belief, Paragon facilitated the provision of the transformers and other materials and equipment installed and used at the unlawful marijuana grow operation, all in furtherance of the racketeering activity.

95.     Upon information and belief, Paragon, which is in the business of manufacturing steel piping, facilitated the provision of the steel piping used to construct Flying Bud's perimeter wall, all in furtherance of the racketeering activity.

96.     At all times, Paragon, by and through Defendant Wachob and others, understood and agreed that its actions were to support and advance the unlawful marijuana enterprise. This would be obvious to Paragon both because Wachob owns and controls Paragon and because Paragon's employees would necessarily see and smell the open and obvious unlawful marijuana grow facilities.

97.     Paragon's support for the unlawful marijuana enterprise is a criminal conspiracy that violates 21 U.S.C. § 846 and is racketeering activity under 18 U.S.C. § 1961(1)(D) and 1962(D).

### Assurance Restoration's Participation in the Marijuana Cultivation and Distribution Enterprise

98.     Defendant Bacon owns Assurance Restoration and directs its operations.

99.     Defendant Assurance Restoration associates itself with the unlawful marijuana grow enterprise at Flying Bud.

100.    Assurance Restoration supports the unlawful marijuana grow enterprise by providing employees, equipment, materials, and financial support to Flying Bud.

101.    Assurance Restoration employees, equipment, and materials regularly work at the unlawful marijuana grow enterprise in furtherance of the racketeering activity.

102.     The photographs below depict Assurance Restoration trucks being used at the unlawful marijuana grow operation:



View of an Assurance Restoration truck at the unlawful marijuana operation.



View of Assurance Restoration trucks at the unlawful marijuana operation.

103.    At least one of the helicopters that frequently flies over the Grants' home is registered with Canyon Creek Investments, LLP whose principal place of business is located at the same address as Assurance Restoration, tail number 418SV.

104.    At all times, Defendant Assurance Restoration understood and agreed that its actions were to support and advance the illegal marijuana enterprise.  This would be obvious to Assurance Restoration both because Bacon owns and controls Assurance Restoration and because Assurance Restoration's employees would necessarily see and smell the open and obvious unlawful marijuana grow facilities.

105.    Assurance Restoration's support for the unlawful marijuana enterprise is a conspiracy that violates 21 U.S.C. § 846 and is racketeering activity under 18 U.S.C. § 1961(1)(D) and 1962(D).

### D-Luxe's Participation in the
### Marijuana Cultivation and Distribution Enterprise

106.    Defendants Wachob and Bacon each own D-Luxe and direct its operations. Defendants Wachob and Bacon designate themselves as each owning and being managers of D-Luxe on the application forms filed with the OMMA.

107.    Defendant D-Luxe filed its Articles of Organization with the State of Oklahoma on March 17, 2021. The State of Oklahoma approved D-Luxe's marijuana dispensary license on March 23, 2021.

108.    Defendant D-Luxe Dispensary, LLC is wholly owned by D-Luxe Holdings, LLC. According to D-Luxe Holdings, LLC's Operating Agreement, D-Luxe Holdings, LLC is owned 50/50 by Defendants Bacon and Wachob. Defendant Bacon holds his units in D-Luxe Holdings, LLC through his investment company, Defendant Bacon Investments.

109.    Defendant D-Luxe associates itself with the illegal marijuana enterprise. D-Luxe designated itself as an "Affiliated Entity" of Flying Bud on its application forms filed with the OMMA.

110.    Defendant D-Luxe supports the unlawful marijuana enterprise by purchasing Flying Bud's marijuana for commercial sale.

111.    Defendant D-Luxe's support for the unlawful marijuana grow operations is a conspiracy that violates 21 U.S.C. § 846 and is racketeering activity under 18 U.S.C. § 1961(1)(D) and 1962(D).

112.    Defendant D-Luxe actively participates in the unlawful enterprise by selling marijuana in various forms at its dispensary in violation of 21 U.S.C. § 841(a) and is racketeering activity under 18 U.S.C. § 1961(1)(D).

113.    Defendant D-Luxe advertises its marijuana for sale on the internet using a website and social media in violation of 21 U.S.C. § 843(c)(2)(A). Such advertising constitutes racketeering activity under 18 U.S.C. § 1961(1)(D). D-Luxe's internet page advertises "Better Cannabis for a Better Community." D-Luxe's mission statement announces it is "a firm built on integrity by a TEAM working in unison towards a common goal of providing the highest level of customer satisfaction[.]"[15] D-Luxe's mission statement for its unlawful marijuana enterprise and racketeering activity is nearly identical to Defendant Paragon's: "Paragon is a Team working in unison toward a common goal of providing the highest level of customer satisfaction."[16]

---

[15] https://d-luxedispensary.com/ (Last accessed December 30, 2021).
[16] http://www.paragonindinc.com/company (Last accessed December 30, 2021).

114.    Defendant D-Luxe had its grand opening on April 20, 2021 (4/20 day)[17] in Sapulpa, Oklahoma. The photographs below depict D-Luxe's unlawful dispensary operation in Sapulpa, Oklahoma, where D-Luxe commercially sells the marijuana cultivated at Flying Bud. As can be seen from the photograph, D-Luxe uses the allure of luxury as one of its means to advance the Defendants' object of selling marijuana for profit.



D-Luxe Dispensary.



D-Luxe Dispensary.

---

[17] April 20 is an unofficial "holiday" associated with the use of marijuana.

115.    At the grand opening, Defendant Wachob also used his other interests to advance Defendant D-Luxe's unlawful marijuana sales and to increase the conspiracy's profit. D-Luxe advertised on its social media page for people to come "check out the Black Diamond boat, the first MTI 52' catamaran!" The Black Diamond boat is depicted in the photograph below, which was used as part of D-Luxe's advertising and in furtherance of its attempt to cast itself as a luxury brand of marijuana:



Black Diamond Racing boat used by the Defendants to advance D-Luxe's unlawful marijuana sales.

116.    Upon information and belief, Defendant Wachob owns and operates Black Diamond Racing. The Miami Boat Show Poker Run advertisement below depicts Defendant Wachob in a Black Diamond Racing boat in Miami, Florida:



Miami Boat Show Poker Run Advertisement depicting Defendant Wachob in a Black Diamond Racing boat.

117.    Black Diamond is also the highest level of achievement for Defendant D-Luxe's rewards program, which provides customers with points for every dollar spent at D-Luxe:



D-Luxe Dispensary's Rewards Program information as seen on its website.[18]

---

[18] https://d-luxedispensary.com/promotions/ (Last accessed August 12, 2021)

118.    The photograph below depicts Defendant Wachob's Black Diamond Racing team along with a helicopter, tail number N442LN—the same helicopter that frequently flies to and from Flying Bud over the Grants' home.



Black Diamond Racing with helicopter, tail number N442LN

119.    Defendant D-Luxe sells all kinds of marijuana products, including flower, concentrates, edibles, pre-rolls, topicals, and CBD extract. D-Luxe uses clever names as one of its means to advance the Defendants' object of selling marijuana for profit. D-Luxe's products for sale include names such as the "Danky Kong," "Devil's Crack," "Lemon Skunk" (in apparent reference to the foul odor of marijuana), and the "Mob Boss."

120.    The photographs below depict just some of the types of products Defendant D-Luxe advertises for sale at its dispensary operation:



D-Luxe "On-The-Go-Recovery" product.



D-Luxe edible product.



D-Luxe product.

121.    The Defendants agreed to participate in and assist the unlawful marijuana cultivation and distribution enterprise with full knowledge of its overall objective of growing and selling marijuana. There was interdependence among the members of the unlawful marijuana cultivation and distribution conspiracy, that is to say, the members, in some way or manner, intended to work together for their shared mutual benefit within the scope of the conspiracy. This was accomplished through numerous violations of the CSA, each of which constitutes racketeering activity. The RICO Defendants knew and intended that in agreeing to assist the unlawful marijuana enterprise, they would help it engage in a pattern of racketeering activity.

## VI.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of 18 U.S.C. § 1962(c)
### Against All Defendants

122.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

123.    RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Defendants each violated this provision of 18 U.S.C. § 1962.

124.    The Defendants formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) by establishing relationships with each other, collaborating to develop the 12260 W. 171st Street property for marijuana cultivation, and agreeing to sell that marijuana through D-

Luxe, and perhaps others. This enterprise enables the Defendants to more efficiently achieve their collective purpose.

125.    The Defendants have moved money, goods, and services procured by the enterprise in interstate commerce, and the enterprise sells marijuana in interstate commerce.

126.    The Defendants each have some part in directing the enterprise's affairs.

127.    Defendant Flying Bud operates an unlawful marijuana grow facility at the 12260 W. 171st Street property. Flying Bud, through its owner Defendant Bacon, applied for and obtained a marijuana grow license from the State of Oklahoma. Flying Bud constructed facilities specially designed for cultivating marijuana. Flying Bud cultivates marijuana for commercial sale. This activity constitutes participation in a pattern of racketeering.

128.    Defendant Bacon is an owner of Flying Bud who manages, controls and directs Flying Bud's operations. Defendant Bacon also owns the property on which Flying Bud operates the unlawful marijuana grow enterprise. This activity constitutes participation in a pattern of racketeering.

129.    Defendant Bacon, through his ownership and control of Defendant Assurance Restoration, has provided employees, equipment, and other resources to support Flying Bud's construction and operation of the illegal marijuana grow enterprise. This activity constitutes participation in a pattern of racketeering.

130.    Defendant Bacon has transmitted through his investment company, Bacon Investments, proceeds, in whole or in part, from the marijuana cultivation and distribution enterprise.

131.    Defendant Wachob manages, controls, and directs Flying Bud's operations, including the construction of facilities specially designed for cultivating and growing marijuana and the actual growth and cultivation of the marijuana for sale. This activity constitutes participation in a pattern of racketeering.

132.    Defendant Wachob, through his ownership and control of Defendant Paragon, has provided employees, equipment, and other resources to support Flying Bud's construction and operation of the illegal marijuana grow enterprise. This activity constitutes participation in a pattern of racketeering.

133.    Defendants Wachob and Bacon also own, manage, control, and direct Defendant D-Luxe's marijuana dispensary business. D-Luxe possesses, markets and sells marijuana. This activity constitutes participation in a pattern of racketeering.

134.    Upon information and belief, the Defendants have used communication facilities to further the unlawful marijuana growth, cultivation and sale operations in violation of 21 U.S.C. § 843(b).

135.    Flying Bud and Defendants Bacon and Wachob possess materials, goods, and facilities for the manufacture of marijuana in violation of 21 U.S.C. § 843(a)(6). All of these activities are racketeering activity under 18 U.S.C. § 1961(1)(D).

136.    Defendants' racketeering activities have directly and proximately injured the Grants' property by causing noxious odors, loud noises, vibrations, bright light, and stormwater to travel onto the Grants' property, interfering with the Grants' use and enjoyment of their property, diminishing its market value, and making it more difficult to sell.

## COUNT II
### Violation of 18 U.S.C. § 1962(d)
### Against All Defendants

137.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

138.    RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c).

139.    Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

140.    The Defendants, for their mutual and individual profit, agreed and conspired to violate 18 U.S.C. § 1962(c) by forming an association-in-fact enterprise for the purpose of cultivating marijuana at 12260 W. 171st Street and then selling it commercially through Defendant D-Luxe.  Defendants knew that this unlawful scheme could only be accomplished through a pattern of racketeering activity because maintaining a property at which marijuana is cultivated and sold, cultivating and selling marijuana, and possessing the goods and materials necessary to cultivate and process marijuana are all unlawful under the CSA. *See, e.g.*, 21 U.S.C. §§ 841(a), 843(a)(6), 856.

141.    Defendants have engaged in racketeering activity in furtherance of their conspiracy to violate 18 U.S.C. § 1962(c). These Defendants violated 18 U.S.C. § 1962(d) and 21 U.S.C. § 846 by agreeing and conspiring to assist in the establishment, construction and operation of the unlawful marijuana grow enterprise.

142.    The United States Supreme Court has interpreted the RICO conspiracy provision, 18 U.S.C. § 1962(d), as "even more comprehensive than the general conspiracy offense[.]"[19]"A

---

[19] *Salinas v. United States*, 522 U.S. 52, 63 (1997).

conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." [20]

143.   It is not necessary that all RICO conspirators commit an overt criminal act. "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." [21] "One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense." [22]

144.   Defendant Flying Bud's participation in the conspiracy includes owning and operating the unlawful marijuana grow enterprise.

145.   Defendants Bacon and Wachob's participation in the conspiracy includes but is not limited to owning, directing and operating the unlawful marijuana grow operation at Flying Bud and the unlawful marijuana sales operation at Defendant D-Luxe, and using their other businesses to participate in and advance the drug cultivation and distribution enterprise.

146.   Defendant Paragon and Defendant Assurance Restoration's participation in the conspiracy includes providing employees, equipment and resources to support the unlawful marijuana grow enterprise.

147.   Defendant D-Luxe's participation in the conspiracy includes purchasing the marijuana product, advertising the marijuana product, selling the marijuana product, and then collecting and distributing the proceeds of the unlawful enterprise.

---

[20] *Id.*
[21] *Id.* at 64.
[22] *Id.* at 65.

148.    Racketeering activities undertaken in furtherance of conspiracy to violate 18 U.S.C. § 1962(c) have injured the Grants' property. Specifically, the agreement to create the marijuana grow, the construction, and the operation of the marijuana facility at 12260 W. 171st Street in violation of 21 U.S.C. § 856 and the conspiracy of which those actions are a part directly and proximately injured the Grants' property by causing noxious odors, noise, bright light, and stormwater to travel onto the Grants' property, interfering with the Grants' use and enjoyment of their property, diminishing the property's market value, and making it more difficult to sell.

## COUNT III
### NUISANCE
### AGAINST ALL DEFENDANTS

149.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

150.    This count states a claim against all Defendants for a nuisance under Oklahoma law.

151.    Under Oklahoma law, a nuisance "arises from an unreasonable, unwarranted, or unlawful use" of property.[23] A nuisance is an act, or failure to do an act, that annoys, injures or endangers the comfort, repose, health, or safety of others, offends decency, or in any way renders others insecure in life or in the use of property.[24]

152.    Defendants have engaged in a host of activities in connection with the unlawful marijuana grow operation that have been unreasonable, unwarranted, or unlawful. These activities have annoyed, injured, and endangered the Grants' comfort, repose, health, and safety, have offended decency, and have rendered the Grants' insecure in the use of their property.

---

[23] *See Briscoe v. Harper Oil Co.*, 702 P.2d 33, 36 (Okla. 1985).
[24] 50 O.S. § 1.

70

153.    The Defendants have caused the foul, noxious odor of marijuana to travel onto the Grants' property thereby interfering with the Grants' use and enjoyment of their property and resulting in a diminution in property value.

154.    The foul and noxious odors of the unlawful marijuana grow operation have caused Stephanie to experience severe allergy symptoms, headaches, and nausea.

155.    The Defendants have engaged in loud and obnoxious activity that has caused unwanted noise to travel onto the Grants' property thereby interfering with the Grants' use and enjoyment of their property and resulting in a diminution in property value. These loud noises include the noise of the industrial fans that circulate the marijuana stench and the noise of industrial equipment performing construction work during the day and night.

156.    The Defendants have caused the unlawful marijuana grow facility to be brightly illuminated at night, causing annoyance and injury to the Grants' comfort, repose, use, and enjoyment of their property, and also resulting in a diminution in property value.

157.    The Defendants have caused an open and obvious unlawful marijuana cultivation and distribution enterprise to operate immediately adjacent to the Grants' property. The presence of the unlawful marijuana cultivation and distribution enterprise is an unreasonable, unwarranted, and unlawful use of the 12260 W. 171st Street property which annoys, injures, and endangers the comfort, repose, health, or safety of the Grants, offends decency, and renders the Grants insecure in the use of their property.

158.    Defendants Wachob and Bacon fly helicopters at low altitudes above the Grants' property to and from the illegal marijuana grow operation at the 12260 W. 171st Street property.

Defendants have at times intentionally and maliciously circled or hovered over the Grants' home. Defendants have left the helicopters running after landing. The foregoing causes loud noises and vibrations to travel onto the Grants' property.

159.    Defendants Flying Bud, Wachob, Bacon, Paragon and Assurance Restoration materially altered segments of the 12260 W. 171st Street property located within a floodplain. Such alterations caused a significant amount of stormwater to be diverted onto the Grants' property, resulting in substantial flooding and damage to the Grants' property.

160.    Plaintiffs are entitled to damages for physical injury to their property, for injury to their use and enjoyment of their property, and for the harm to their comfort, health, and repose.

161.    Plaintiffs are entitled to an abatement of the nuisances set forth herein.

## COUNT IV
### INJURY TO PROPERTY
### AGAINST DEFENDANTS FLYING BUD, BACON, WACHOB, PARAGON AND ASSURANCE RESTORATION

162.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

163.    This count states a claim against Defendants Flying Bud, Bacon, Wachob, Paragon, and Assurance Restoration under Oklahoma law for injury to the Plaintiffs' property.

164.    As set forth herein, Defendants Flying Bud, Bacon, and Wachob, Paragon and Assurance Restoration failed to exercise ordinary care when they intentionally altered the 12260 W. 171st Street property, including areas within a floodplain. The Defendants' actions materially altered land, resulting in the diversion of significant amounts of stormwater onto the Plaintiffs' property.

165.     As a direct and proximate result of Defendants' intentional acts, the Plaintiffs have suffered actual damages to their property.

166.     Plaintiffs are entitled to damages for the injury to their property, including other incidental costs, attorney's fees, court costs, and interest pursuant to 12 O.S. § 940.

167.     In addition to breaching their duty to exercise ordinary care, Defendants' actions in altering the 12260 W. 171st Street property were taken with reckless disregard to the Plaintiffs' property. Such conduct gives rise to punitive damages pursuant to 23 O.S. § 9.1.

## COUNT V
### INJUNCTIVE RELIEF
### AGAINST ALL DEFENDANTS

168.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

169.     This Court has the authority to grant preliminary and permanent injunctive relief to enjoin unlawful racketeering activity. *See* 18 U.S.C. § 1964.

170.     This Court has the authority to grant preliminary and permanent injunctive relief to enjoin activity constituting a nuisance under applicable state law.

171.     As a result of Defendants' actions detailed herein, Plaintiffs are suffering ongoing and irreparable harm.

172.     Plaintiffs seek a preliminary and permanent injunction against Defendants directing that the Defendants cease engaging in unlawful racketeering activity, including, but not limited to, the unlawful cultivation, processing, and distribution of marijuana.

173.     Plaintiffs seek a preliminary and permanent injunction against Defendants directing that the Defendants cease engaging in activity constituting a nuisance, including, but not limited

to, flying helicopters at low altitudes, operating the industrial fans, engaging in heavy construction activity, and any further alterations of the floodplain.

## PRAYER FOR RELIEF

174.   WHEREFORE, Plaintiffs demand a trial by jury and pray for an order and judgment as follows:

    a.   Granting a preliminary injunction to enjoin the Defendants from further unlawful racketeering activities, including, but not limited to, the unlawful cultivating, processing, and distribution of marijuana.

    b.   Granting a preliminary injunction to enjoin the Defendants from further nuisance activity, including, but not limited to, flying helicopters at low altitudes, operating the industrial fans, engaging in heavy construction activity, and any further alterations of the floodplain.

    c.   Awarding Plaintiffs three times their damages that were caused by the Defendants' racketeering activities.

    d.   Awarding Plaintiffs damages to compensate them for the loss of use and enjoyment, as well as damage, to their property as a result of the Defendants' maintenance of the nuisance.

    e.   Awarding Plaintiffs damages for the physical injury to their property as a result of Defendant Flying Bud, Bacon, Wachob's, Paragon and Assurance Restoration's alteration of the land within the floodplain and diversion of stormwater.

    f.   Abatement of the nuisances set forth herein.

    g.   Permanently enjoining the Defendants from continuing to engage in racketeering activities.

    h.   Permanently enjoining the Defendants from further nuisance activity and an abatement of the nuisance.

    h.   Disgorgement of the Defendants' profits obtained from the racketeering activities.

    i.   Awarding Plaintiffs their reasonable costs, including attorney's fees incurred in bringing this action.

j.   Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

_____
R. Trent Shores, OBA No. 19705
John D. Russell, OBA No. 13343
Justin A. Lollman, OBA No. 32051
Barrett L. Powers, OBA No. 32485
**GABLEGOTWALS**
110 North Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
(918) 585-4800
(918) 595-4990 (fax)
*tshores@gablelaw.com*
*jrussell@gablelaw.com*
*jlollman@gablelaw.com*
*bpowers@gablelaw.com*

**COUNSEL FOR PLAINTIFFS
KEITH AND STEPHANIE GRANT**