**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KEITH GRANT and** | ) |
| **STEPHANIE GRANT,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | )   **Case No. 22-CV-1-TCK-CDL** |
| **v.** | ) |
| | ) |
| **FLYING BUD FARMS, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**OPINION AND ORDER**</u>

Before the Court by referral of the District Judge (Doc. 58) is the defendants'

Motion to Disqualify (Motion) (Doc. 56, 57).[1] Plaintiffs filed a Response in Opposition

(Doc. 60), and defendants filed a Reply in Further Support of Defendants' Motion (Doc.

64).

**I.      Background**

On January 3, 2022, attorneys with GableGotwals filed the Complaint (Doc. 2) on

behalf of the plaintiffs. The Complaint asserts claims under the federal Racketeer and

Corrupt Organizations Act (RICO) and state-law claims for nuisance and injury to

property, arising out of the defendants' alleged operation of a marijuana farm on property

adjacent to the plaintiffs' residence in Creek County, Oklahoma. (Doc. 2 at 2). The

---

[1]      The Tenth Circuit has confirmed that a referred motion to disqualify counsel "is among the nondispositive matters which a magistrate judge may decide," pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. § 636(b)(1)(a). *Hutchinson v. Pfeil*, 105 F.3d 562, 565 (10th Cir. 1997). *See* Fed. R. Civ. P. 72(a); *see also McCans v. City of Truth or Consequences*, 360 F. App'x 964, 966 n.3 (10th Cir. 2010).

Complaint seeks injunctive relief precluding the defendants from continuing certain alleged business-related activities; damages, including treble damages as authorized under RICO; and costs and attorney's fees. *Id*. at 7, 74. The defendants include nineteen business entities and two individuals: Derek Wachob and Gary David Bacon, Jr., who are alleged to be business partners in the alleged marijuana operation. *Id*. at 3.

Through their Motion, defendants seek to disqualify GableGotwals from representing the plaintiffs on two alternative grounds, based on Sections 1.7 and 1.9(a) of the Oklahoma Rules of Professional Responsibility (ORPC). First, the defendants argue that GableGotwals' representation violates ORPC 1.7 ("Conflict of Interest: Current Clients"), because they contend Bacon is a current client of the firm and has not consented to the representation. Alternatively, the defendants argue that, even if Bacon is a former client of GableGotwals, the firm should be disqualified under ORPC 1.9 ("Conflict of Interest: Former Clients"), because the pending lawsuit is substantially related to the Beck Lawsuit.

## A.      Prior Litigation Involving Bacon

*Burggraf Lawsuit*

In 2007, Bacon was a defendant in a civil lawsuit, *Burggraf Services Inc. et al. v. Gary David Bacon*, CJ-2007-5849 (Burggraf Lawsuit), in Tulsa County District Court. Bacon was represented in that case by Robert Glass until May 2008, when Glass and his firm at the time sought to withdraw from the case. Glass later joined GableGotwals.

<u>Beck Lawsuit</u>

Beginning in 2015, GableGotwals represented Canyon Creek Investments, LLP and its principals—including Bacon and another individual, John Longacre—in a lawsuit in Tulsa County District Court against Danny Beck Chevrolet, Inc., Danny J. Beck, and Kathleen M. Beck (Beck Defendants). *See Canyon Creek Investments, LLP et al. v. Danny Beck Chevrolet et al.*, CJ-2015-04160 (Beck Lawsuit). Canyon Creek alleged damages arising from a 2015 stock purchase agreement between the parties and asserted claims for money loaned, breach of contract, bad faith, and unjust enrichment. (Doc. 56-5). The Beck Defendants filed counterclaims asserting, in part, that Canyon Creek had wrongfully intercepted funds from Zurich American Insurance Company (Zurich) by making fraudulent misrepresentations to Zurich. (*See* Doc. 56 at 6; Doc. 56-6 ¶¶ 21, 24).

On November 2, 2015, GableGotwals sent an engagement letter to Canyon Creek, addressed to the attention of Longacre. The letter specified that Canyon Creek had engaged GableGotwals "solely with respect to the [Beck Lawsuit]." (Doc. 56-4). It also stated that "[n]otice of termination or withdrawal by either party will be made in writing and will be effective upon receipt." *Id*. The letter was signed by GableGotwals attorney Steven Adams, but was not signed by Longacre, Bacon, or anyone else on behalf of Canyon Creek. *Id*.

In June 2018, the Beck Lawsuit concluded in a jury verdict for the Canyon Creek plaintiffs. (Doc. 56 at 6).[2] On June 8, 2018, the parties reached a settlement agreement as to damages. Pursuant to the settlement agreement, the Beck Defendants were to pay

---

[2]     The Beck Defendants dismissed their counterclaims prior to trial. (*See* Doc. 56 at 6).

$375,000 to Bacon and $25,000 to Longacre, using funds that had been held in suspense with Zurich. *Id*. However, in July 2018, GableGotwals attorney Ryan Pittman learned that Zurich had previously advanced a portion of the funds—totaling approximately $21,000— to the Beck Defendants, unbeknownst to the plaintiffs. (Doc. 56-13).

In a July 24, 2018 email to Bacon and Longacre, Pittman stated:

> I was not aware that Zurich had paid the $21K to Danny. I think this is a serious misrepresentation in our settlement agreement. Let's consider how we want to move forward.

(Doc. 56-13). There is no evidence that either Bacon or Longacre responded. According to Pittman, Bacon never responded and has never asked Pittman about collecting any further payment due under the settlement agreement. (Doc. 56).

On September 10, 2018, GableGotwals sent an invoice for legal services rendered through August 31, 2018 to Bacon and Longacre. (Doc. 56-18; Doc. 60-4 ¶ 6). According to Pittman, GableGotwals did not perform any legal work for Bacon after that date. (Doc. 60-4 ¶ 7).[3]

On March 25, 2019, Pittman emailed Bacon to inquire, "When you want to talk about how to go after big D? I saw George the other day and gave him hell again about them lying to us and the court." (Doc. 56-12 at 13).[4] Again, there is no evidence of a written response. According to Bacon, he and Pittman ultimately agreed that "GableGotwals would

---

[3]     Additional bills were issued through February 2019 for costs associated with the Beck Lawsuit representation, such as a document storage hosting fee. (*See* Doc. 60 at 6 n.3; Doc. 56-21).

[4]     "George" is George Miles, the attorney for the Beck Defendants, and "big D" refers to defendant Danny Beck. (Doc. 56 at 7).

pursue collection of the outstanding[] Zurich amounts due and owing me and the other Beck Lawsuit Plaintiffs, and that any money received by GableGotwals would be used to pay the final invoice to the firm." (Doc. 56-7 ¶ 14).

### B. Bacon's Additional Communications with Pittman

Between 2018 and 2021, Bacon and Pittman continued to have periodic contact via text, e-mail, and telephone. In June 2018, following the trial in the Beck Lawsuit, Bacon and Pittman discussed a potential lawsuit arising from a contract with Cougar Drilling Solutions. (*See* Doc. 56-12).  Bacon and Pittman investigated and corresponded over the next few weeks, ultimately deciding not to pursue a lawsuit. *See id.* Bacon and Pittman also exchanged text messages discussing vacation plans, other personal matters, potential business opportunities, and Bacon's helicopter and home. (*See* Doc. 56-7 ¶ 19; *see also* Doc. 56-12, 56-14, 56-22).

According to Bacon, during a "friendly" phone call with Pittman in the spring of 2021, Bacon told Pittman that he was entering the cannabis business and was partnering with Wachob on the venture. (Doc. 56-7 at ¶ 20).[5]

### C. GableGotwals' Involvement in Litigation Adverse to Bacon

According to Bacon, in August 2021, he received a letter from GableGotwals, on behalf of the plaintiffs, concerning the subject of the present lawsuit. (Doc. 56-7 at ¶ 21). Bacon stated that he was "confused" when he learned GableGotwals represented the

---

[5]     Pittman asserts that he does not recall having discussed Bacon's cannabis business during the phone call. (Doc. 60-4 at ¶ 15).

plaintiffs in bringing claims against him. (*Id*. at ¶ 22). Bacon retained attorneys with McAfee and Taft to represent him in this action.

After plaintiffs filed the Complaint, defendants sought a stay of all proceedings in the case. (*See* Doc. 44). Counsel for plaintiffs and defendants subsequently conferred and agreed to a "limited stay," subject to certain conditions. (Doc. 48). In accordance with the parties' joint motion, the Court granted a temporary stay pending the Court's ruling on the Motion. (*See* Doc. 51).

## II.    Legal Standards

### A.    Standard Governing Motions to Disqualify

Within the inherent supervisory powers of the Court is the discretionary authority to control attorneys' conduct. *Redd v. Shell Oil Co.,* 518 F.2d 311, 314 (10th Cir. 1975). Consequently, motions to disqualify counsel are committed to the Court's sound discretion. *E.E.O.C. v. Orson H. Gygi Co. Inc.,* 749 F.2d 620, 621 (10th Cir. 1984). "Except where a purely legal issue is involved, a district court's order of disqualification will be reversed only if the court has abused its discretion." *Id*.; *see also Cole v. Ruidoso Mun. Schs*., 43 F.3d 1373, 1383 (10th Cir. 1994) (citation omitted).

Two sources of authority guide the exercise of this discretion. *Cole*, 43 F.3d at 1383. "First, attorneys are bound by the local rules of the court in which they appear." *Id*. Consistent with federal courts' general practice of adopting the rules of the state in which they are situated, the Northern District of Oklahoma has adopted the Oklahoma Rules of Professional Conduct ("ORPC") as the standard governing attorney conduct. *See* N.D.

Okla. LGnR 3-2; *see also Cole*, 43 F.3d at 1383. Therefore, one source of law that the Court must consult is the ORPC.

Additionally, "because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law." *Cole*, 43 F.3d at 1383; *see also United Sates v. Stiger*, 413 F.3d 1185, 1195 (10th Cir. 2005) (*overruled in part on separate grounds*; *see U.S. v. Ellis*, 868 F.3d 1155, 1177 (10th Cir. 2017)). Under Tenth Circuit law, "motions to disqualify are governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigants' rights." *Cole*, 43 F.3d at 1383 (emphasis added).

Thus, although federal courts must consult state rules of professional conduct, they are not bound by state-court interpretations of such rules. *See Weeks v. Indep. Sch. Dist. No. I-89 of Okla. County*, 230 F.3d 1201, 1214 (10th Cir. 2000) (Briscoe, J., concurring) (explaining that neither the district court nor the Tenth Circuit was bound by the Oklahoma Supreme Court's interpretation of ORPC 4.2 because "ethical rules in federal court are subject to a national standard"). Nonetheless, because "it would arguably create procedural difficulties for practitioners in Oklahoma were we to adopt an interpretation of [an ORPC] different from that adopted by the Oklahoma Supreme Court," *id*., the Court must "apply[] standards developed under federal law," *Cole*, 43 F.3d at 1383, while attempting to avoid any inconsistencies with state law that would "create procedural difficulties for practitioners in Oklahoma." *Id*.; *see Weeks*, 230 F.3d at 1214 (Briscoe, J., concurring); *see also Acct. Principals, Inc. v. Manpower, Inc.*, 599 F. Supp. 2d 1287 (N.D. Okla. 2008).

Disqualification is not warranted automatically upon a finding that an attorney has violated a disciplinary rule. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980); *Central Milk Prod. Co-Op v. Sentry Food Stores*, 573 F.2d 988, 991 (8th Cir. 1978); *W.T. Grant v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976); *see also Biocore Med. Techs., Inc., v. Khosrowshahi*, 181 F.R.D. 660, 664 (D. Kan. 1998); *Bodily v. Intermountain Health Care Corp.*, 649 F. Supp. 468 (D. Utah 1986). In determining whether disqualification is warranted, courts weigh various factors, including prejudice to the moving party, as well as "society's interest in ethical conduct, the prerogative of parties to choose their own counsel, and the hardship of disqualification." *Lassiter v. Hidalgo Med. Servs.*, 2018 WL 1322135, at *6 (D.N.M. Mar. 13, 2018) (unpublished) (citing *Rubio v. BNSF Railway Co.*, 548 F. Supp. 2d 1220, 1223-24 (D.N.M. 2008)); *accord Flying J, Inc. v. TA Oper'g Corp.*, 2008 WL 648545, at *6 (D. Utah Mar. 10, 2008) (unpublished) (discussing factors); *Khosrowshahi*, 181 F.R.D. at 664.[6]

In Oklahoma courts, the test for granting a motion to disqualify counsel is whether continued representation would threaten the integrity of the judicial process. *Arkansas Valley State Bank v. Phillips*, 171 P.3d 899, 905 (Okla. 2007); *see also Miami Bus Servs., LLC v. Davis*, 299 P.3d 477, 484 (Okla. 2013). Under that standard, disqualification "is such a drastic measure that it should be invoked if, and only if, the Court is satisfied that real harm is likely to result." *Phillips*, 171 P.3d at 905; *Davis*, 299 P.3d at 484. The burden rests with the moving party to establish the likelihood of such harm by a preponderance of

---

[6]     Under 10th Cir. R. 32.1(A), "[u]npublished decisions are not precedential, but may be cited for their persuasive value."

the evidence. *See Davis*, 299 P.3d at 484; *see also Phillips*, 171 P.3d at 910-11.[7] While the Court is not bound by Oklahoma's interpretation of the applicable rules, this is in accordance with federal law as applied by other district courts within the Tenth Circuit. *See, e.g.*, *Lassiter*, 2018 WL 1322135, at *6; *Manpower, Inc.*, 599 F. Supp. 2d at 1294-95; *Khosrowshahi*, 181 F.R.D. 660, 664 (D. Kan. 1998) (internal citation omitted) ("The essential issue is whether the alleged misconduct taints the lawsuit. The Court should not disqualify counsel unless 'the offending attorney's conduct threatens to taint the underlying trial with a serious ethical violation.'"); *see also Weeks*, 230 F.3d at 1211 (acknowledgment that disqualification is an "extreme sanction"); *Cole*, 43 F.3d at 1384.[8]

---

[7]    Under Oklahoma law, before ruling on a motion to disqualify counsel based on conflict of interest or improper possession of confidential information, a court must hold an evidentiary hearing and make a specific factual finding that the attorney had knowledge of material and confidential information. *Davis*, 299 P.3d at 488. However, federal courts are not bound by this requirement. *See Layne Christensen Co. v. Purolite Co.*, 2011 WL 1113543, at *6 (D. Kan. Mar. 24, 2011) (unpublished); *Manpower, Inc.*, 599 F. Supp. 2d at 1294. Moreover, because the briefing before the Court includes substantial evidence in the form of exhibits, and most central facts relevant to the Motion are not disputed, the Court finds that a hearing would not assist its decision on the Motion.

[8]    Some federal courts have held that any doubt should be resolved in favor of disqualification of counsel. *See, e.g., Khosrowshahi*, 181 F.R.D. at 664; *In re Blinder, Robinson & Co.*, 123 B.R. 900, 907 (Bankr. D. Colo. 1991); *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 194-95 (D.N.J. 1989). The Oklahoma Supreme Court has rejected this standard, noting that "it would be possible in nearly any suit to create a shadow of a doubt about the very subjective determination of the appearance of an opposing attorney's actions." *Phillips*, 171 P.3d at 910. Regardless, federal and Oklahoma courts have identified similar factors that the court should balance. *See Phillips*, 171 P.3d at 908; *Khosrowshahi*, 181 F.R.D. at 664; *Flying J, Inc.*, 2008 WL 648545, at *6 (discussing factors). Federal courts have also stated that the party seeking disqualification carries a "heavy burden" and must meet a "high standard of proof." *In re Blinder, Robinson & Co.*, 123 B.R. at 907-08.

### B.      ORPC 1.7 and 1.9

ORPC 1.7, entitled "Conflict of Interest: Current Clients," provides:

**(a)** Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

> **(1)** the representation of one client will be directly adverse to another client; or

> **(2)** there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

**(b)** Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

> **(1)** the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

> **(2)** the representation is not prohibited by law;

> **(3)** the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

> **(4)** each affected client gives informed consent, confirmed in writing.

Okla. Stat. tit. 5, Ch. 1, App.3-A, Rule 1.7.

ORPC 1.9, entitled "Conflict of Interest: Former Clients," provides, in relevant part:

**(a)** A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

. . .

**(c)** A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

> **(1)** use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with

10

respect to a client, or when the information has been generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

*Id*. at Ch. 1, App. 3-A, Rule 1.9.

## III.   Discussion

### A.   Whether Bacon Was a Current or Former Client of GableGotwals

A threshold question is which portion of the ORPC applies. ORPC 1.7 addresses a law firm's current clients, while ORPC 1.9 addresses former clients. To identify the applicable rule, the Court must determine whether Bacon was a current client or a former client of GableGotwals at the relevant time. Bacon argues that he remained a current client of GableGotwals in August 2021, when he received a demand letter from the firm on behalf of plaintiffs regarding the alleged marijuana farm. Plaintiffs contend that the attorney-client relationship with Bacon terminated shortly after the Beck Lawsuit concluded in June 2018.

The party asserting the existence of an attorney-client relationship bears the burden to show such a relationship exists. *See Int'l Tele-Marine Corp. v. Malone & Assocs., Inc.*, 845 F. Supp. 1427, 1431 (D. Colo. Mar. 7, 1994); *see also Cole*, 43 F.3d at 1384. The existence of an attorney-client relationship does not depend on the execution of a formal contract, nor on the payment of fees. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1317 & n.6 (7th Cir. 1978); *see also Layne Christensen Co.*, 2011 WL 1113543, at *6. Once formed, an attorney-client relationship may be terminated unambiguously or when it is clear the client is no longer relying on the attorney to represent the client's interests. *Hartleib v. Weiser Law Firm, P.C.*, 2019 WL 3943064, at *7 (D. Kan. Aug. 21,

2019) (unpublished). If the attorney is retained for a specific matter, the representation generally ends when that matter is resolved. *Id.*, 2019 WL 3943064 at *7; *see also JuxtaComm-Texas Software, LLC v. Axway, Inc*., 2010 WL 4920909, at *2 (E.D. Tex. Nov. 29, 2010) (unpublished) ("The general rule is that representation of a client ends when the purpose of that representation ends.").

There is no question that GableGotwals and Bacon had an attorney-client relationship in connection with the Beck Lawsuit. Although the claims in that case were resolved via a jury trial and post-verdict settlement in June 2018, defendants argue that Bacon remained a client of GableGotwals until August 2021. Defendants offer two arguments in support of this assertion: (1) GableGotwals had not completed its role in the Beck Lawsuit, and (2) the parties had a broader attorney-client relationship that extended beyond the Beck Lawsuit. In support of both arguments, defendants assert that Bacon subjectively believed GableGotwals continued to represent him.

The Court will first examine whether the Beck Lawsuit formed the basis of an attorney-client relationship between Bacon and GableGotwals in August 2021. The Beck Lawsuit claims were tried before a jury in June 2018, resulting in a verdict for Canyon Creek, and shortly after the verdict, the parties reached a settlement agreement as to payment. GableGotwals' last bill for legal services in the Beck Lawsuit is dated September 10, 2018. (Doc. 60-4 ¶ 6). E-mail communication between Bacon and GableGotwals on August 9, 2018, indicates that Bacon had paid his portion of fees from the Beck Lawsuit. (Doc. 56-17; *see also* Docs. 56-16, 56-21 (April 2019 statement of account)).

12

Nonetheless, defendants assert that GableGotwals has not carried the Beck Lawsuit through to completion. Bacon's affidavit states that, in August 2021, he believed the Beck Lawsuit remained an open matter and that GableGotwals was continuing to pursue recovery of the funds Zurich had advanced to the Beck Defendants. (Doc. 56-7 at ¶ 4). Defendants argue that the late-discovered issue of Zurich's advance payment extended the life of Bacon's relationship with GableGotwals. They contend the $21,000 Zurich had advanced to the Beck Defendants "was not [a] run-of-the-mill overdue payment; it was a fundamental breach of the settlement agreement . . . that may have entitled Mr. Bacon to pursue additional remedies." (Doc. 56 at 17).

However, there is no evidence that Bacon engaged GableGotwals to pursue additional remedies *on his behalf* at any time after receiving GableGotwals' final bill for services in 2018. According to Bacon, after learning that Zurich had advanced a portion of the suspended funds to the Beck Defendants, Bacon agreed with GableGotwals that any additional funds the firm recovered "would be used to pay the final invoice to the firm." (Doc. 56-7, ¶ 14 (emphasis added)). Although Bacon does not state when that conversation took place, it appears to have occurred by the middle of 2019. (*See id.*; *see also* Doc. 56-12 (text correspondence); Doc. 56-19 (January 2019 invoice); Doc. 56-21 (April 2019 account statement).

13

As such, Bacon's account with the firm appears to have been resolved by mid-2019.[9] According to Pittman, GableGotwals subsequently closed its file on the Beck Lawsuit. (Doc. 60-4 ¶ 8). This is consistent with Bacon's acknowledgment that the Beck Lawsuit "lasted three years" and his reference to the "final invoice." (Doc. 56-7 ¶¶ 10, 14).

Defendants fault GableGotwals for failing to send a written notice or other formal communication terminating its representation in the Beck Lawsuit. (Doc. 56-7 ¶¶ 15, 17). While courts have "recognize[d] that best practices generally recommend the clear and unambiguous communication of termination of the attorney-client relationship, . . . these practices are not required." *Hartleib*, 2019 WL 3943064, at *7. Moreover, a formal notice of termination may be less essential when the scope of representation was limited to a specific matter. "When an attorney-client relationship is established, the relationship generally terminates once the purpose of the employment is completed, absent a contrary agreement." *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990).

Defendants argue that there is a contrary agreement here. In 2015, GableGotwals sent a retainer letter to the attention of Canyon Creek Investments regarding the Beck Lawsuit. (R. 56-4). The letter stated that "[n]otice of termination or withdrawal by either party will be made in writing and will be effective upon receipt." *Id*. However, there was no written agreement between GableGotwals and Bacon. While best practices would have the firm send a formal termination letter, given the circumstances already discussed, it is

---

[9]     Defendants' brief asserts that GableGotwals "continued to seek payment from [Bacon] for outstanding amounts due the firm." (Doc. 56 at 14). However, the cited exhibits indicate that in August 2018, Bacon paid approximately half of the account balance, and the parties understood that Longacre would pay the remaining balance. (Doc. 56-17).

clear that the Beck Lawsuit resolved well before August of 2021. Thus, the Beck Lawsuit did not form the basis of an attorney-client relationship between GableGotwals and Bacon at that time.

Second, defendants contend that GableGotwals had an ongoing attorney-client relationship with Bacon that survived the end of the Beck Lawsuit. Defendants argue that Bacon subjectively believed his relationship with GableGotwals was broader, asserting that he "had been relying . . . for years" on attorneys associated with GableGotwals. (Doc. 56 at 13). For example, Robert Glass, who later joined GableGotwals, represented Bacon and his companies "as early as 2008." (Doc. 56 at 13). After the Beck Lawsuit concluded, Bacon and Pittman continued to communicate periodically about personal matters and a potential investment opportunity. Bacon also consulted Pittman about a different potential legal matter shortly after the jury trial had concluded in the Beck Lawsuit. (Doc. 56-7 ¶ 18). Bacon states that he "consider[s] Mr. Pittman [his] attorney." (Doc. 56-7 ¶ 18).

However, a preponderance of the evidence indicates that GableGotwals' attorney-client relationship with Bacon was limited to the Beck Lawsuit. Although Bacon consulted Pittman on another potential legal matter in July 2018, it is undisputed that Bacon ultimately did not pursue that matter or hire GableGotwals for any further legal work after the Beck Lawsuit. *Id*. Moreover, the fact that Bacon anticipated working with Pittman again "in the future" suggests that he understood GableGotwals was no longer representing him. (Doc. 56-6 ¶ 18). *Compare Home Trust Mtg. Co. v. Bank of New Mexico*, 1998 WL 36030292, at *1 (D.N.M. Sept. 10, 1998) (unpublished) (evidence inadequate to establish a continuing attorney-client relationship, despite client's claim of a "personal [and]

15

professional relationship . . . of some twelve or thirteen years' duration" with the attorney; attorney had "represented [the former client] in a matter, the matter was concluded, and the attorney-client relationship ended at that point").[10]

Defendants argue that disqualification is warranted because Bacon "believes that GableGotwals represents him." (Doc. 56 at 13). In his affidavit, Bacon states that he was "confused" when he learned in August 2021 that GableGotwals was representing Plaintiffs adverse to him, and that he "consider[s] Pittman [his] attorney." (Doc. 56-7 ¶¶ 18, 22). However, a subjective belief alone does not establish an attorney-client relationship. Such a belief must be reasonable. *Cole*, 43 F.3d at 1384.

Here, the defendants argue that the lack of a written engagement agreement between GableGotwals and Bacon shows the firm's "intention to make [Bacon] an ongoing client" and demonstrates "commitment to [Bacon] beyond the Beck Lawsuit." (Doc. 56 at 14). However, Defendants cite to no authority supporting this proposition, and it is inconsistent with Bacon's affidavit, which indicates that he sought GableGotwals' representation specifically for the Beck Lawsuit. (Doc. 56-7 ¶ 6) ("I retained GableGotwals in the fall of 2015 to bring a lawsuit against Danny Beck."). Moreover, given the fact that Bacon employed different law firms in the interim, and GableGotwals did not perform or bill for any legal work for him after September 2018, a reasonable person would understand that the attorney-client relationship did not extend beyond the Beck Lawsuit.

---

[10]    Bacon also does not dispute that he has hired different counsel in other matters in the years since the Beck Lawsuit concluded. (*See* Doc. 60 at 4; Doc. 64 at 6).

Accordingly, the Court finds that Bacon was a former client of GableGotwals, not a current client of the firm, in August 2021. The evidence indicates that the attorney-client relationship terminated well before GableGotwals contacted Bacon on behalf of the plaintiffs in this case. ORPC 1.7 therefore is not applicable, and ORPC 1.9 is the appropriate rule to determine whether there is a conflict that would warrant GableGotwals' disqualification in this case.

### B.      ORPC 1.9 Analysis

Under Tenth Circuit law, a party seeking to disqualify opposing counsel pursuant to ORPC 1.9(a) must establish that "(1) an actual attorney-client relationship existed between the moving party and the opposing counsel; (2) the present litigation involves a matter that is 'substantially related' to the subject of the movant's prior representation; and (3) the interests of the opposing counsel's present client are materially adverse to the movant." *Stiger*, 413 F.3d at 1196 (internal citation omitted); *see also Manpower, Inc*., 599 F. Supp. 2d at *1292. If the movant establishes the first two prongs, "an irrebuttable presumption arises that a client has indeed revealed facts to the attorney that require his disqualification." *Stiger*, 413 F.3d at 1196 (citing *Smith v. Whatcott*, 757 F.2d 1098, 1100 (10th Cir. 1985); *see also Manpower, Inc.*, 599 F. Supp. 2d at *1292 (citing *Stiger*) (internal citation omitted).

The existence of a prior attorney-client relationship between Bacon and GableGotwals is not contested and need not be addressed further; nor is it disputed that plaintiffs' interests are materially adverse to Bacon in this lawsuit. Accordingly, the

17

Court's analysis will focus on the second element of ORPC 1.9(a), *i.e.*, whether the present case is substantially related to the Beck Lawsuit.

In applying the "substantial relationship" test, the Court must "look to whether 'the factual contexts of the two representations are similar or related.'" *Stiger*, 413 F.3d at 1196 (citing *Whatcott*, 757 F.2d at 1100)); *see also SLC Ltd. V v. Bradford Group West*, 999 F.2d 464, 466 (10th Cir. 1993). Under Oklahoma law, matters may be substantially related if they involve the same transaction or legal dispute, or if there is a substantial risk that confidential information "as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Okla. Stat. tit. 5, Ch.1, App. 3-A, Rule 1.9, Cmt. 3. "The scope of a 'matter' for purposes of [ORPC 1.9] depends on the facts of a particular situation or transaction." *Id*. In determining whether matters are substantially related, "[t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." *Cole*, 43 F.3d at 1384 (citing comments to ORPC 1.9).

There is no suggestion that the Beck Lawsuit and the present case arise from the same transaction or legal dispute. Rather, Defendants assert that, as a result of GableGotwals' work on Bacon's behalf in the Beck Lawsuit, the firm's attorneys received sensitive and/or confidential financial information that materially advantages the plaintiffs in this case.[11] Defendants contend that GableGotwals obtained private and confidential

---

[11]     Plaintiffs' brief also addresses the Burggraf Lawsuit, noting that Glass had withdrawn from representing Bacon more than five years before he joined GableGotwals.

18

information about the finances of Bacon and one of his companies, Assurance Restoration LLC, which is also named as a defendant in this case.

ORPC 1.9 is not a blanket prohibition on attorneys representing clients adverse to a former client. ORPC 1.9 prohibits representation only if confidential information "that would normally have been obtained in the prior representation" would "materially advance" the adverse party's position in a later proceeding. Okla. Stat. tit. 5, Ch.1, App. 3-A, Rule 1.9, Cmt. 3.[12] Moreover, "[i]nformation that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying." *Id*. The rule also recognizes that "[i]information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related." *Id*.

Under the applicable federal standard, the defendants need not establish GableGotwals' actual knowledge or actual use of specific information.[13] In moving for disqualification,

> [a] former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

---

Glass asserts that he has no recollection of any confidential factual information received from Bacon related to the Burggraf Lawsuit. (Doc. 60 at 5).

[12]    ORPC 1.9(a) is identical to the ABA Model Rule of Professional Conduct. *See* ABA Model Rule of Prof'l Conduct 1.9. Thus, the Oklahoma rule reflects the national standard.

[13]    *See Stiger*, 413 F.3d at 1196; *Manpower, Inc.*, 599 F. Supp. 2d at 1293-94. The Oklahoma Supreme Court has disagreed with this view. *See Davis*, 299 P.3d at 486-87.

19

Okla. Stat. tit. 5, Ch. 1, App. 3–A, Rule 1.9, Cmt 3. To illustrate how knowledge of a former client's private information might "materially advance" an adversary's position, the comments to ORPC 1.9 explain that, for example, "a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce." *Id*. In another case, the Tenth Circuit held that an attorney was disqualified from representing a secured creditor in a bankruptcy proceeding against a former client, where the attorney had knowledge of the former client's financial position, negotiating strategies, and capacity to settle its outstanding debt. *SLC Ltd.*, 999 F.2d at 467 (applying Utah rules).

Both illustrations of prohibited representation under ORPC 1.9 involve proceedings to determine the rights to, and valuation of, a party's assets and/or liabilities. It is not difficult to imagine how an attorney's knowledge of a former client's confidential financial information might prejudice the former client, if the attorney represented an opposing party. Such a conflict could threaten "real harm to the integrity of the judicial process," if the lawyer were not disqualified from the adverse representation. *Phillips*, 171 P.3d at 905.

On the other hand, the comments to ORPC 1.9 explain that other types of representation are permissible. An attorney who "previously represented a client in securing environmental permits to build a shopping center" could then permissibly represent a tenant of the completed shopping center "in resisting eviction for nonpayment of rent." Okla. Stat. tit. 5, Ch.1, App. 3-A, Rule 1.9, Cmt. 3. The comments further explain that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client *in a factually distinct problem of that*

20

*type*[,] even though the subsequent representation involves a position adverse to the prior client." *Id*. at Cmt. 2 (emphasis added).

The plaintiffs' claims in this case arise from the defendants' alleged use of real property. The causes of action alleged in the Complaint consist of private claims under RICO, nuisance, and injury to property, and the remedies sought include damages and injunctive relief directing that the Defendants cease certain activities on their property. (*See* Doc. 2 at 65-74). The claims asserted in the Complaint do not inherently require the valuation of real property or other assets, such as in a bankruptcy or divorce proceeding. Thus, this case is unlike the type of proceeding that would be prohibited based on an attorney's knowledge (or potential knowledge) of a former client's business and personal financial information.

Defendants point out that the Beck Defendants asserted fraud counterclaims, asserting that Bacon and his co-plaintiffs misrepresented their ability to satisfy their contract obligations. In connection with the counterclaims, GableGotwals came into possession of a financial statement dated June 7, 2015, listing Bacon's assets and liabilities, along with other information about his finances and businesses. (*See* Doc. 56-8 (hereinafter the "2015 Statement"). The 2015 Statement lists Assurance Restoration LLC, which is a defendant in this lawsuit, among Bacon's assets, and indicates Bacon's ownership percentage and the estimated value of that business. *See id*. The 2015 Statement also lists Bacon's real estate, including the property at issue in this lawsuit. (*See* Doc. 56 at 20-21). Bacon's deposition in the Beck Lawsuit also addressed details of his "personal wealth, the valuation of Assurance Restoration, and his relationship with Mr. Wachob." *Id*. at 21.

Several factors indicate that this information is not within the category that triggers a ban on subsequent representation against Bacon or Assurance Restoration. First, as contemplated in the comments to ORPC 1.9, financial information from seven years ago is likely to be stale and would not offer a reliable picture of Bacon's current assets and liabilities. The Court is not persuaded that GableGotwals' possession of this information would materially advantage the plaintiffs here. Second, the 2015 Statement was not provided to GableGotwals in confidence—rather, it was produced to the Beck Defendants via third-party subpoena by a financial institution. (Doc. 60-4 ¶ 3; *see* Doc. 56-8). While defendants protest that the 2015 Statement ultimately was not used at trial, they do not dispute that it was disclosed to the Beck Defendants. (*See* Doc. 64 at 8). As such, the 2015 Statement falls within a category of information that the rule's comments identify as not disqualifying.

Moreover, the Beck Lawsuit claims arose from a 2015 contract to purchase an auto dealership. (*See* Doc. 56-6). There is no evidence that transaction or the resulting settlement have any bearing on the defendants' alleged operation of a cannabis farming operation beginning in 2019. Thus, the present case involves a distinct set of facts with little, if any, relevance to the assets and liabilities Bacon possessed four years before he allegedly started the cannabis operation.

This case is factually distinguishable from others in which the Court found disqualification was warranted. *See, e.g.*, *Manpower, Inc.*, 599 F. Supp. 2d at 1298 (finding two lawsuits "involved the same underlying client agreement and client relationship . . . [and] the same underlying allegations"); *Lee v. BP p.l.c. et al.*, No. 15-CV-525-TCK-FHM,

22

slip op. at 8-9 (N.D. Okla. Oct. 11, 2018 (noting that "[b]oth matters involve the alleged contamination of the [same] site by the [same company]," and complaint in second proceeding "specifically references . . . the very matters [that the conflicted attorney] handled on behalf of" a successor entity to the same company). Nor do the circumstances here indicate a "changing of sides," as the Beck Lawsuit and the current case involve different businesses in separate industries and present distinct legal issues (contract vs. nuisance and RICO claims). *Stiger*, 413 F.3d at 1196 (quoting comments to Model Rules of Prof'l Conduct R. 1.9).

Defendants note that a different court granted a motion to disqualify based on an attorney's familiarity with a former client's assets and business entities. *See Pravak v. The Meyer Eye Group, PLC*, 2008 WL 4372914 (W.D. Tenn. 2008) (unpublished). The claims in *Pravak* turned, in part, on whether the defendant's medical practice had been dissolved or had simply changed its name and continued operating under a different name. *Id*. at *1. The conflicted attorney was associated with another lawyer, who had previously represented the practice and its principal "as a general counsel and advisor," providing "extensive and pervasive" representation and obtaining "extensive knowledge about [the principal's] private financial information and the structure and operations of his various businesses, including his medical entities." *Id*. at *7. Thus, the law firm's extensive previous representation of the former client's businesses distinguishes *Pravak* from the

circumstances here.[14] Additionally, unlike in *Pravak*, the claims here do not involve questions about the corporate organization of the defendants' businesses.

Defendants also contend GableGotwals learned facts through its prior representation of Bacon that it has used to inform its actions in this case. For example, they suggest that knowledge of Bacon's assets and net worth informed the firm's decision to take on the plaintiffs' case and to seek treble damages pursuant to RICO. But harm based on "speculation and conjecture" is insufficient to warrant disqualification. *Funplex P'ship v. F.D.I.C.*, 19 F. Supp. 2d 1201, 1206 (D. Colo. 1998).

Defendants note that the Complaint refers to a helicopter and its registration with Canyon Creek Investments, and assert that GableGotwals learned this information through its relationship with Bacon.[15] Additionally, they assert that Pittman "learned directly from Mr. Bacon about this medical marijuana farm and partnership with Mr. Wachob prior to their filing of the Complaint." (Doc. 56 at 22). However, the existence of these assets can be found in publicly available documents, and therefore is the type of information that "ordinarily will not be disqualifying." Okla. Stat. tit. 5, Ch.1, App. 3-A, Rule 1.9, Cmt. 3. Nor have the defendants provided any non-speculative grounds to find that GableGotwals possesses information that materially advances its client's position in this case.

---

[14]     Additionally, the *Pravak* case applied the professional responsibility rules of a different state and is not otherwise binding on this Court.

[15]     Pittman mentioned the helicopter in a text to Bacon dated July 3, 2018. (*See* Doc. 56-12 at 10 ("I see you flew the chopper today…").

Bacon's communication with Pittman on matters other than the Beck Lawsuit did not give rise to a broader attorney-client relationship, as discussed *supra*. Although Bacon allegedly told Pittman about his medical marijuana business in early 2021, Bacon does not assert that he sought Pittman's legal advice on that business. Moreover, the business did not exist at the time GableGotwals was representing Bacon in the Beck Lawsuit. As such, these circumstances do not threaten the integrity of the judicial process if GableGotwals continues to represent the plaintiffs in this case.

Finally, defendants argue that, because GableGotwals attorneys are familiar with Bacon's demeanor, they possess "unique, 'inside' information . . . on how [] Bacon would present in a deposition or on the witness stand at trial." (Doc. 56 at 22). They object to the possibility that the plaintiffs' lawyers could easily inquire with Pittman about Bacon's "jury appeal" and whether Bacon "was amenable to prep and . . . followed attorney direction well." (Doc. 64 at 10). Defendants point to Pittman's cross-examination of another witness in the Beck Lawsuit, in which Pittman asked whether the witness believed that Bacon "has an odd . . . way of expressing himself," and the witness affirmed that it is "sometimes hard to tell if [Bacon is] being serious or if he's joking." (*See* Doc. 56-9 at 18). However, the defendants cite no authority holding that attorneys' familiarity with a former client's demeanor warrants disqualification from subsequently representing another party adverse to the former client. Moreover, the Court could not find the required harm on this basis without engaging in improper speculation or conjecture.

For the reasons set forth above, the Court finds there is no substantial relationship between GableGotwals' prior representation of Bacon and its representation of the plaintiffs in this case. Accordingly, disqualification is not warranted under ORPC 1.9.

IV.    **Conclusion**

Defendants' Motion to Disqualify (Docs. 56, 57) is **denied**. Pursuant to the March 30, 2022 Order (Doc. 51), the stay is **lifted**.

Dated this 26th day of July, 2022.

Christine D. Little
United States Magistrate Judge

26